[No. A095206. First Dist., Div. Two. Apr. 15, 2002.]

In re RAPHAEL P. III, a Person Coming Under the Juvenile Court Law.
SAN FRANCISCO DEPARTMENT OF HUMAN SERVICES, Plaintiff
and Respondent, v.
RAPHAEL P., Defendant and Appellant.

**COUNSEL**

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Louise H. Renne, City Attorney, Kamala D. Harris and Jennifer Williams, Deputy City Attorneys, for Plaintiff and Respondent.

Janet G. Sherwood, under appointment by the Court of Appeal, for Minor.

## OPINION

**KLINE, P. J.**—Raphael P. (appellant) appeals from an order of the juvenile court denying him presumed father status in the dependency proceeding concerning minor Raphael P. III (Raphael). He contends the trial court's ruling, based upon a blood test confirming he was not the minor's biological father, was erroneous. The minor, who took a position contrary to appellant's in the trial court, has changed position on appeal, now arguing in appellant's favor. We reverse.

### STATEMENT OF THE CASE AND FACTS

Raphael was born in August 1997. His birth certificate lists his mother as Niemaha E., age 16, and his father as appellant, age 19.

According to appellant's declaration, he was in a relationship with Niemaha E. when Raphael was conceived, she told him he was the father and he so believed. Appellant was at this time in a drug rehabilitation program at Walden House. When he was released, appellant went to live with his grandmother, Agnes J., on Duke Court in San Francisco. Niemaha, then four and a half months pregnant, was in a foster home from which she frequently "went 'AWOL.' " Agnes J. tried to arrange with the San Francisco Department of Human Services (Department) for Niemaha to live with her; although this effort was unsuccessful, Niemaha moved in anyway and lived with appellant throughout her pregnancy. Appellant contributed to her financial support, was present at Raphael's birth in August 1997, was listed as the father on the baby's birth certificate, and believed he signed a form at the hospital stating that he was the baby's father. When Niemaha and Raphael left the hospital, they lived with appellant at his grandmother's house. Appellant contributed financially to Raphael's support, cared for him, played with him, and took him to doctor's appointments.

On October 24, 1997, the Department filed a petition alleging that Raphael came within the provisions of Welfare and Institutions Code section 300, subdivision (b) in that his mother was a dependent of the court and was "AWOL" with the minor, the mother refused to go to placement, the mother had dropped out of school and had no legal means of support, and "[t]he adult father may be harboring the minor mother and the baby and is not cooperating with this agency in getting the minor mother back into placement." This petition listed the baby's father as Curtis T. and the father's address as "c/o" Yolanda B. at the Duke Court address; notice of the hearing was mailed to Curtis T., "c/o" Yolanda B. Yolanda B. is appellant's mother. The parties failed to appear for a hearing on November 14 and the matter

was continued to December 19, the court's minutes indicating that notice had been given to the father, who had failed to appear, and that the mother's whereabouts were unknown. Notice of this hearing had been addressed to "Curtis T[.]," "c/o Yolanda B[.]" The hearing was again continued to January 23, 1998, at which time it was taken off calendar pending service of a warrant.

Meanwhile, according to appellant's declaration, in December 1997, when Raphael was about four months old, appellant was required to return to Walden House for an additional five months to complete his diversion program. After 30 days, he was permitted to bring Raphael to Walden House for visits and spent 10 hours with Raphael each Saturday. Raphael was living with Niemaha at her grandmother's house. When appellant was released from Walden House, Raphael was living in Oakland with Yolanda B., who told appellant that Niemaha had dropped the baby off. Over the next five months, appellant frequently stayed with Raphael at Yolanda B.'s house and sometimes took Raphael with him to Agnes J.'s house; Niemaha sometimes stayed with them.

Appellant was arrested in October 1998 and incarcerated at the San Francisco County Jail in San Bruno until May 1999. During this time, Yolanda B. brought Raphael to visit appellant. Upon his release, appellant went to live again at Agnes J.'s house and continued to live there after she died. Yolanda B. and Raphael moved to Taylor Street in San Francisco and appellant spent weekends with them. Yolanda B. also brought Raphael to stay overnight with appellant. Appellant saw Raphael at least three times a week after May 1999. He considered Raphael his son, Raphael called him "Daddy," and appellant's extended family accepted Raphael as his son.

On November 12, 1999, a subsequent petition was filed alleging that Raphael came within the provisions of Welfare and Institutions Code section 300, subdivision (b), in that the mother had given conflicting information as to the minor's whereabouts, which were currently unknown; the mother left the minor at home alone at night on October 1, 1999; the mother had a history of abandoning her children and on November 10, 1999, had left the minor's half sibling with the paternal grandmother without making provisions for his ongoing care; the mother had not benefited from family preservation services; the mother had a history of unstable housing; the mother temporarily resided in the home of the grandmother, Alberta T., and the mother's paternal uncle, who was an alleged sexual offender; and the mother was a previous dependent of the court. This petition listed the father as Romear P., subsequently changed to Raphael P., and his address as "c/o" Yolanda B. at a Taylor Street address.

The Department's report indicated that it received a report on October 2, 1999, from the mother of a friend of Niemaha's, with whom Niemaha had been living, that Niemaha had gone out the night before, leaving two-year-old Raphael and his one-month-old half brother, Keandre J., with no one to take care of them. On November 10, 1999, the Department was contacted by Crystal J., Keandre's paternal grandmother, who reported that the baby had been left with her and Niemaha had not come to get him. The Department's report stated that Raphael's whereabouts were unknown.

In a subsequent report, the Department stated that Raphael had been located on November 16, at the home of Yolanda B. Yolanda B. said Raphael had been living with her since about November 10 and the social worker placed the child with her.

At a hearing on November 19, the court detained Raphael and approved his placement with Yolanda B. The court found notice had been given as required by law and the father had willfully failed to appear for the hearing. The court's minutes list Raphael's father as "Curtis T[.]" and a subsequent "notice concerning rehearing" was sent to "Curtis T[.]" at the Duke Court address.

At the jurisdictional hearing on December 6, the court found the allegations of the subsequent petition true. The court's minutes listed the father as Romear P. In its jurisdictional/dispositional hearing report, which referred to appellant by his correct name, the Department stated that appellant lived in Hunters Point but used his mother's Taylor Street address as his mailing address. The social worker stated she had "contacted" appellant at his mailing address but had received no response. It was recommended that Raphael remain in the care of Yolanda B. because he was "very bonded with her," she had his child care and medical care in place, and her apartment had ample room.

At a dispositional hearing on January 21, 2000, again in appellant's absence, the court continued Raphael's placement with Yolanda B. On February 22, the court vacated the findings it had made as to appellant on December 6, 1999, and January 19, 2000. Appellant was found to have willfully failed to appear, the petition was amended to allege that the father's ability to care for the child was unknown, and this allegation was found true. The record contains the notice of the February 22, 2000, hearing that was mailed to appellant at Yolanda B.'s address on February 2.

In the Department's July 5, 2000, status review report, the social worker related that she had on four occasions asked Yolanda B. to have appellant

call to arrange visitation, that Yolanda B. represented she had transmitted these messages, and that appellant had not contacted the worker. Notice of the July 20 hearing was mailed to appellant at Yolanda B.'s address, as was notice of its continuation to September 7. Appellant did not appear at the hearing; the dependency and Raphael's placement were continued.

On February 14, 2001, a supplemental petition was filed alleging that Yolanda B. had failed to provide adequate care for Raphael; that she had an ongoing substance abuse problem that interfered with her ability to care for the minor; that she had an open in-home dependency case regarding her own son, Ramone C.; and that there was an open referral regarding Yolanda B. and her 11- and 13-year-old daughters.

On February 15, with appellant in court, Raphael was ordered detained in an emergency shelter. The court ordered paternity testing for appellant.

The Department's March 5 report indicated that it had recently discovered Yolanda B. had had an open-family maintenance case regarding her son Ramone since he was returned to her care on October 28, 1999, having been removed for neglect in December 1995. Yolanda B. had signed a statement on November 16, 1999, that she had never been investigated for or involved in child abuse or neglect. On February 7, 2001, the Department received its 15th referral regarding Yolanda B. and her children, alleging general neglect of her daughters. The Department reported there was evidence that Yolanda B.'s daughters were providing most of Raphael's care and that Yolanda B. was struggling with her sobriety, as well as that Yolanda B. was having trouble paying bills and had engaged in welfare fraud by accepting two adult "fast passes" a month. Raphael's behavior had reportedly been deteriorating since the end of November, with him displaying aggressiveness toward other children. He had been placed in foster care with Keandre, in the home of Susan S., on February 9. Susan S. wanted to adopt Keandre and stated that she would also give Raphael a permanent home.

The social worker reported that she met appellant for the first time on February 9, 2001. Appellant asked if Raphael could be placed with him. The social worker discussed reunification requirements and appellant stated he had no prior knowledge of them because he had been incarcerated. Appellant stated that he lived between the houses of his aunt and his girlfriend and that his son had been visiting him regularly. After Raphael's removal, appellant had been coming to the Department for visits with him. Appellant stated in his declaration that he initially was not aware of the dependency proceeding and became involved immediately upon learning of it.

The genetics test ordered by the court excluded appellant as Raphael's father.

After continuances, the review hearing was set for April 5, 2001. On March 29, appellant filed a motion for presumed father status, which was opposed by counsel for Raphael. On April 5, the trial court denied appellant's motion and sustained the supplemental petition. Appellant's application for a rehearing on his motion for presumed father status was denied on May 3. On May 10, the court terminated reunification services and set a Welfare and Institutions Code section 366.26 hearing for September 19, 2001.

Appellant filed a notice of appeal on May 31, 2001.[1]

Our opinion in this matter, which was filed on March 14, 2002, affirmed the judgment. Appellant and Raphael then each filed petitions for rehearing. We granted rehearing on March 29, 2002, and, reversing the judgment, we now also reverse ourselves. As has been noted, " 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' " (*Smith v. Anderson* (1967) 67 Cal.2d 635, 646 [63 Cal.Rptr. 391, 433 P.2d 183] (conc. opn. of Mosk, J.), quoting Justice Rutledge's dissent in *Wolf v. Colorado* (1949) 338 U.S. 25, 47 [69 S.Ct. 1359, 1371, 93 L.Ed. 1782].)

## DISCUSSION

Family Code[2] section 7611 provides in pertinent part: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540) or Chapter 3 (commencing with Section 7570) of Part 2 or in any of the following subdivisions: [¶] . . . [¶] (d) He receives the child into his home and openly holds out the child as his natural child. . . ."[3] The presumption set forth in section 7611, subdivision (d), "is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).)

Only one of the other two means of establishing presumed father status mentioned in section 7611 is relevant to this case: Section 7570 et seq.

---

[1]Appellant's parental rights were terminated at a hearing on November 27, 2001. Respondent, on January 24, 2002, after completion of the briefing on appeal, asked this court to take judicial notice of the termination order and to dismiss the appeal as moot. We take judicial notice of the order but deny the request for dismissal. If the trial court's determination that appellant could not be considered Raphael's presumed father was incorrect, the resulting termination proceedings which occurred without appellant's participation could not stand.

[2]Unless otherwise indicated, all further statutory references are to the Family Code.

[3]Under the other subdivisions of section 7611, a man is presumed to be the natural father of a child if: "(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by

provides for voluntary declarations of paternity which, when filed with the Department of Child Support Services, have the force and effect of a judgment of paternity. (*In re Liam L.* (2000) 84 Cal.App.4th 739, 746-747 [101 Cal.Rptr.2d 13].)[4]

■ Appellant and Raphael maintain that appellant is Raphael's presumed father under both section 7611, subdivision (d), and section 7570 et seq. The trial court rejected the former contention because it found the presumption of section 7611, subdivision (d), rebutted by the genetic test excluding appellant as Raphael's biological father.[5] It rejected the latter contention because it found no evidence a voluntary declaration of paternity had in fact been filed with the required agency.

I.

Under section 7611, subdivision (d), a man is "presumed to be the natural father of a child if he . . . [¶] . . . [¶] . . . receives the child into his home and openly holds out the child as his natural child." Appellant argues that he fulfilled the requirements of this statute because he lived with Raphael's mother during her pregnancy, he attended Raphael's birth and was listed on the birth certificate as Raphael's father, Raphael and the mother lived with appellant at his grandmother's home for several months after Raphael was born, appellant regularly stayed with Raphael at appellant's mother's home after appellant completed his diversion program and frequently had Raphael

death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.

"(b) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce.

"(2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation.

"(c) After the child's birth, he and the child's natural mother have married, or attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) With his consent, he is named as the child's father on the child's birth certificate.

"(2) He is obligated to support the child under a written voluntary promise or by court order."

[4]The other means, not applicable to the present case, is through the conclusive presumption of section 7540: "[T]he child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage," except as demonstrated by blood tests sought within two years of the child's birth according to the provisions of section 7541.

[5]This issue is currently pending before the California Supreme Court in *In re Nicholas H.,* review granted November 14, 2001, S100490.*

*Reporter's Note: For Supreme Court opinion, see 28 Cal.4th 56.

with him at his grandmother's home, and appellant and all his extended family viewed Raphael as appellant's son. The trial court, without deciding whether the facts supported application of the presumption, accepted the argument of Raphael's trial counsel that the blood test demonstrating appellant was not Raphael's biological father precluded appellant from establishing the presumption of paternity or rebutted that presumption.

The trial court relied primarily upon *In re Olivia H.* (1987) 196 Cal.App.3d 325 [241 Cal.Rptr. 792] (*Olivia H.*), which held that a man shown by blood tests not to be the biological father was precluded from establishing presumptive father status under the predecessor statute to section 7611, subdivision (d). *Olivia H.* equated the blood test results with a judgment of paternity, holding that the case was governed by the statutory directive that " '[t]he presumption [that a man is the natural father of a child] is rebutted by a court decree establishing paternity of the child by another man.' " (*Olivia H.*, at p. 330; see § 7612, subd. (c).)[6]

Other courts have since questioned this conclusion. *In re Jerry P.* (2002) 95 Cal.App.4th 793, 804 [116 Cal.Rptr.2d 123] (*Jerry P.*) disagreed with *Olivia H.*: "In our view, section 7612, subdivision (c), contemplates a situation in which a man of flesh and blood, as opposed to a mere hypothetical man, is put forward as the father of the child. Otherwise, a child could be precluded from having a loving, nurturing relationship with a committed father by a man the child may never even have met, who may be totally uninterested in the child and who cannot obtain presumed father status in his own right." Previously, the court in *Comino v. Kelley* (1994) 25 Cal.App.4th 678, 686, footnote 10 [30 Cal.Rptr.2d 728] (*Comino*), had noted: "We question whether a negative blood test of one man is the equivalent of an affirmative judicial declaration of paternity of another man, but we need not decide the issue here."

It is clear that a man is not required to produce evidence of biological paternity to be declared a presumed father under section 7611. (*Comino, supra,* 25 Cal.App.4th at p. 685 [construing former Civ. Code, § 7004].) The question in this case, however, is whether biological proof of nonpaternity necessarily precludes presumed father status.

This question was answered in the negative, at least in the context of dependency proceedings, in *Jerry P.* In *Jerry P.,* the child was removed from

---

[6]At the time *Olivia H.* was decided the presumption now contained in section 7611, subdivision (d), was contained in former Civil Code section 7004, subdivision (a)(4). Former Civil Code section 7004, subdivision (b), provided that the "presumption is rebutted by a court decree establishing paternity of the child by another man." (Stats. 1987, ch. 192, § 1, p. 1156.) Section 7612, subdivision (c), differs from the former statute only in that it refers to a "judgment" rather than a "court decree."

the mother's custody and placed in foster care shortly after birth; the man who believed himself to be the father had held himself out as the baby's father from the time he learned of the mother's pregnancy, provided support to the mother during her pregnancy, visited the baby every day at the hospital until the baby was moved to the foster home without his knowledge, then visited regularly once he was permitted by the court. Blood tests, however, confirmed the man was not the biological father.

In addition to disagreeing with *Olivia H.*, as described above, *Jerry P.* followed *In re Kiana A.* (2001) 93 Cal.App.4th 1109 [113 Cal.Rptr.2d 669] (*Kiana A.*), which had previously interpreted section 7612, subdivision (a), "as giving the trial court discretion to decide whether proof the 'presumed father' is not the biological father is sufficient to rebut the presumption." (*Jerry P., supra*, 95 Cal.App.4th at p. 803.) *Kiana A.* noted that section 7612, subdivision (a), "states a presumption of paternity '*may* be rebutted *in an appropriate action only* by clear and convincing evidence.' (Italics added.) Thus, although the results of genetic testing constitute clear and convincing evidence, it does not follow that such evidence will rebut the presumption in every case. Rather, the statute seeks to protect presumptions of paternity, once they have arisen, from being set aside except upon clear and convincing evidence and only in an appropriate case." (*Kiana A., supra*, at pp. 1118-1119; *Jerry P. supra*, at pp. 803-804.)

*Jerry P.* further questioned whether presumed fatherhood even should be treated as an evidentiary presumption in the dependency context. In dependency cases, presumed fathers are entitled to reunification services while "mere biological" fathers are not. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751] (*Zacharia D.*).)[7] Thus, *Jerry P.* noted that while the primary purpose of section 7611 is to establish paternity

[7]The statutes the Supreme Court construed in *Zacharia D.* which led it to conclude that only presumed fathers are entitled to reunification services have since been changed. At that time, Welfare and Institutions Code former section 361.5 required provision of reunification services to "the minor and the minor's parents or guardians" (Stats. 1986, ch. 1122, § 13, p. 3984) and the first statutory differentiation between "presumed," "alleged" and "natural" fathers appeared in statutes addressing potential termination of parental rights, beginning with Welfare and Institutions Code section 366.23 requiring notice of a Welfare and Institutions Code section 366.26 hearing to both presumed and alleged fathers. (*Zacharia D., supra*, 6 Cal.4th at p. 448.) Currently, Welfare and Institutions Code section 361.5 requires reunification services for "the child and the child's mother and statutorily presumed father or guardians. Upon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child." This statutory change does not alter the point that *Jerry P.* drew from *Zacharia D.*, that presumed fathers rate higher in dependency proceedings than biological fathers, as the current statute makes reunification services mandatory for presumed fathers but discretionary for biological fathers.

through presumptions, the purpose of the statute in the dependency context is to determine whether an alleged father has demonstrated sufficient commitment to parental responsibilities to be given the rights to reunification services and custody. (*Jerry P., supra,* 95 Cal.App.4th at p. 804.) *Jerry P.* stated that "[i]t would not make sense to use the categories in section 7611 simply to establish an evidentiary presumption a man is a 'natural father' when being a 'natural father' is a step *below* being a 'presumed father.' " (*Id.* at p. 805.) Additionally, according to *Jerry P.*, "if the role of section 7611 in a dependency proceeding was merely to establish an evidentiary presumption a man was the child's natural father, a man who was already established to be the child's natural father before dependency proceedings commenced could never become a 'presumed father' because a presumption under the statute would be unnecessary. We fail to see the rationality in a system which would confer more rights on a father when his biological tie to the child is unknown than when it is." (*Ibid.,* fn. omitted.) *Jerry P.* noted language in California Supreme Court cases "suggest[ing] in the dependency context the term 'presumed father' is not an evidentiary term but a term of convenience used to identify a preferred class of fathers by reference to the familial bonds described in section 7611 which the Legislature has determined reasonably approximate the class of fathers it wishes to benefit": "In . . . *Kelsey S.* [*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216]] the court stated: 'A man's parentage of a child may be undisputed and legally proven, but he may nevertheless fail to be a "presumed father" . . . . Conversely, even if paternity is denied *and legally disproved*, a man may be deemed, under some circumstances, to be a "presumed father." ' [(1 Cal.4th at p. 823, fn. 3.)] Although . . . *Kelsey S.* was an adoption case, it relied on the same categories in section 7611 for determining presumed father status as are used in dependency cases. Moreover, in . . . *Zacharia D.*, which was a dependency case, the court noted 'it is possible for a man to achieve presumed father status, with its attendant rights and duties, without being the biological father.' " (*Ibid.,* fns. omitted.)

Other cases also reflect the principle that biology is not necessarily the determining factor with respect to presumed fatherhood. The *Comino* court refused to allow the mother, on appeal, to introduce blood tests she claimed eliminated the probability that the man found to be her child's presumed father was his biological father because she had not introduced these tests in the trial court. (*Comino, supra,* 25 Cal.App.4th at pp. 685-686.) Presumed father status had been established under former Civil Code section 7004, subdivision (a)(4) (now § 7611, subd. (d)), as the man had lived with the mother and child as a family for the two and a half years following birth, supporting the child and sharing care giving responsibilities with the mother. (*Comino,* at p. 682.) *Comino* also rejected the mother's attempt to defeat the

presumed father's claim by relying on the conclusive statutory presumption that the child of a wife living with her husband, who is not impotent or sterile, is a child of the marriage. (§ 7540 [former Evid. Code, § 621, subd. (a)].) Although the mother had been married to another man at the time of conception, the marriage was one of "convenience" to a man with whom she was not sexually involved; therefore the court found the policies underlying the presumption would not be served by applying it to a marriage that existed in name only and that the societal concern for the child to have a father would be better served by preserving the child's relationship with the only man he had ever known as his father. (*Comino, supra,* 25 Cal.App.4th at p. 684.)

In *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*), the Supreme Court held that a man who claimed to be a biological father was not entitled to obtain blood tests to prove his paternity because the mother's husband was the presumed father under section 7611, subdivisions (a) and (d). The mother had separated from her husband and begun living with the alleged biological father at the time of conception, but returned to her husband a couple of months later and raised the child with him.

In *Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354 [216 Cal.Rptr. 748, 703 P.2d 88], the child was conceived while the mother was living with her husband but having an affair with another man, Donald. The husband and wife raised the child together for four years, until they ended the marriage, after which time the husband continued his parental relationship with the child. The mother subsequently married Donald and they sought to establish his paternity. *Michelle W.* upheld application of the section 7540 presumption in favor of the husband, and denial of a motion for blood tests, because the husband's interest in continuing his established relationship with the child and state's interest in "familial stability and the welfare of the child" outweighed Donald's private interest in establishing paternity and the child's interest in a legal determination of her biological parentage. (*Michelle W.,* at p. 363.)

*Kiana A.* also involved competing claims of paternity. The mother had been living with Kevin when she became pregnant, but a few months later began to live with Mario, who was named as father on the birth certificate and who subsequently married the mother. Mario had been incarcerated since about the time of the child's birth and the child did not recall ever having seen him before the dependency proceedings, which began when she was about 12 years old. Kevin had lived with the mother on and off since the child was four years old and treated the child as his own, and the child considered him her father. The trial court denied requests for genetic testing

made by Kevin and by the agency, determined that both Kevin and Mario qualified as presumed fathers and held that Kevin's presumption prevailed because of his relationship with the child. *Kiana A.* rejected Mario's argument that the trial court should have required genetic testing because Mario had not requested such testing in the trial court, but noted that testing would not in any event be determinative: "Even if Mario A. could raise the issue at this juncture, it would fail because biological paternity by a competing presumptive father does not necessarily defeat a nonbiological father's presumption of paternity." (*Kiana A., supra,* 93 Cal.App.4th at p. 1118.)

The above cases refused to allow biological, evidence to enter the determination of paternity by refusing to permit or require evidence of biological paternity tests. Several other cases in which such evidence was presented refused to allow the evidence to control the paternity determination. In *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108 [39 Cal.Rptr.2d 535] (*Steven W.*), the mother separated from her husband, Matthew, moved in with Steven, then conceived the child while on a weekend away with Matthew. Steven participated in all the preparations for the baby, was listed as father on the birth certificate, and shared all caretaking and decision-making concerning the child with the mother. He continued to share custody and support after he separated from the mother some two years after the child's birth, including after Matthew returned to live with the mother. Blood tests confirmed Matthew was the child's biological father. Steven claimed to be the child's presumptive father under former Civil Code section 7004, subdivision (a)(1) (now § 7611, subd. (d)); Matthew claimed to be the presumptive father under that provision as well as under former Civil Code section 7004, subdivision (a)(1) (now § 7611, subd. (a)).

*Steven W.* upheld the trial court's determination that the presumption of Steven's paternity was controlling, despite the blood tests showing Matthew was the biological father, because of Steven's "enduring father-child relationship" with the child. As section 7612, subdivision (b), now provides, former Civil Code section 7004, subdivision (b), then provided that when two or more presumptions conflict, the one "which on the facts is founded on the weightier consideration of policy and logic controls." As the *Steven W.* court explained: "The paternity presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child. The state has an ' "interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability." ' (*Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435, 1442 [37 Cal.Rptr.2d 120], citing *Michelle W. v. Ronald W.*[, *supra,*] 39 Cal.3d 354, 363 . . . .) The courts have repeatedly held, in applying paternity presumptions, that the extant father-child relationship is

to be preserved at the cost of biological ties. (*Michelle W. v. Ronald W., supra,* at p. 363 [alleged biological father's abstract interest in establishing paternity not as weighty as the state's interest in familial stability and the welfare of the child]; *Comino*[, *supra,* 25 Cal.App.4th at p. 684] [court refused to apply conclusive presumption of Evidence Code section 621 to deny the child the only father she had ever known].)

" ' " '[I]n the case of an older child [over two years of age] the familial relationship between the child and the man purporting to be the child's father is considerably more palpable than the biological relationship of actual paternity. A man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved . . . . This social relationship is much more important, to the child at least, than a biological relationship of actual paternity. . . .' " ' (*Susan H. v. Jack S., supra,* 30 Cal.App.4th at p. 1443, quoting *Estate of Cornelious* (1984) 35 Cal.3d 461, 465-466 [198 Cal.Rptr. 543, 674 P.2d 245].)" (*Steven W., supra,* 33 Cal.App.4th at pp. 1116-1117.)

In *Susan H. v. Jack S., supra,* 30 Cal.App.4th 1435, in the midst of proceedings to dissolve her marriage, the mother sought to establish the paternity of another man. The husband had raised the child as his own; the other man disclaimed paternity, relying upon the presumption based on the mother's marriage to her husband. Although blood tests proved the husband was not the father, the court held he remained the presumed father by virtue of his relationship with the child.[8]

In *Rodney F. v. Karen M.* (1988) 61 Cal.App.4th 233 [71 Cal.Rptr.2d 399], a man who had had an affair with a married woman sought to establish paternity to her child. Although blood tests showed he was the father, the trial court applied the presumption of section 7540 to hold that the woman's husband was the father, finding the trial court had erred in ordering the blood test because the other man lacked standing to request it. The child had been raised by the husband and wife and had had no contact with the other man. Similarly, in *Miller v. Miller* (1998) 64 Cal.App.4th 111 [74 Cal.Rptr.2d

---

[8]Appellant also points out that biology does not control in cases involving a husband's consent to artificial insemination of his wife with sperm from a donor. In such cases, the husband is the legal father despite the absence of biological relationship. (*People v. Sorensen* (1968) 68 Cal.2d 280, 284 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093].) Similarly, *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410 [72 Cal.Rptr.2d 280, 77 A.L.R.5th 775] involved a married couple who entered an agreement to have an embryo genetically unrelated to either of them implanted in a surrogate who would give birth to the child. The husband filed for dissolution just before the baby was born and claimed there were no children of the marriage. *Buzzanca* found the husband and wife were both lawful parents of the child despite the lack of biological connection, just as a man who consents to artificial insemination of his wife, although not genetically related to the child, is the child's legal father. (§ 7613.)

797] (*Miller*), the marital presumption was held to prevail over the claim of the apparent biological father, who did not qualify as a presumed father under any of the statutory tests. The husband had a continuing emotional and financial relationship with the child, and the *Miller* court found the other man's interest in establishing paternity insufficient to override the state's interests in "familial stability and the best interest of the child." (*Id.* at p. 120.)

These cases generally reflect a determination that biology is not necessarily determinative of legal paternity, and specifically that social relationships may "trump" genetics in an appropriate case. In all of the above cases, giving legal recognition to biological paternity would have upset an existing parent-child relationship between the presumed father and the child.

Other cases, however, align with *Olivia H., supra,* 196 Cal.App.3d 325, in suggesting that genetic tests disproving a presumptive father's biological connection to the child are dispositive. *In re Marriage of Moschetta*, (1994) 25 Cal.App.4th 1218 [30 Cal.Rptr.2d 893] (*Moschetta*) involved a surrogacy contract in which a husband and wife agreed to have another woman impregnated with the husband's semen. When the husband and wife separated about seven months after the baby was born, each of them as well as the surrogate asserted claims for custody of the child. *Moschetta* held that the surrogate and the husband were the legal parents of the child; the wife was not the mother because she had not given birth to the child and was not genetically related to her. (*Id.* at pp. 1224-1226.) The court rejected the argument that the wife should be considered the mother by a " 'gender-neutral' " (*id.* at p. 1225) application of the presumption that a husband is the legal father of his wife's child if the couple were married and cohabiting at the time of conception and the husband is not sterile. "The argument fails because the presumption is not absolutely conclusive, and may be defeated by blood tests which show that the husband is not the genetic father of the child. The key phrase in California's statutory codification of the rule is, 'Except as provided in Section 7541.' Subdivision (a) of Family Code section 7541 provides that if the conclusions of 'all the experts, as disclosed by the evidence based on blood tests,' is that 'the husband is not the father of the child, the question of paternity of the husband *shall be resolved accordingly.*' . . . . Genetic parenthood established by blood tests trumps a presumption based on the cohabitation of a married couple." (*Ibid.*, italics in original.)[9]

*Johnson v. Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776] (*Johnson*) also involved a surrogacy contract, but one in which an embryo

---

[9]It may be noteworthy that the wife in *Moschetta*, by the time of the appeal, did *not* assert any claim to the child and in fact filed a brief in support of the trial court judgment finding the

created from the egg of a wife and sperm of her husband was implanted in the uterus of another woman who agreed to bear the child for the couple. *Johnson* determined that both women offered acceptable proof of maternity—the surrogate, that she gave birth to the child, and the wife, that she was genetically related to the child—and resolved the issue in favor of the husband and wife based on the intention reflected in the surrogacy contract that they be. the child's parents. As relevant to the present case, in its analysis, *Johnson* stated: "Evidence Code section 892 [(now § 7551)] provides that blood testing may be ordered in an action when paternity is a relevant fact. When maternity is disputed, genetic evidence derived from blood testing is likewise admissible. (Evid. Code, § 892 [(now § 7551)]; see Civ. Code, § 7015 [(now § 7560)].) The Evidence Code further provides that if the court finds the conclusions of all the experts, as disclosed by the evidence based on the blood tests, are that the alleged father is not the father of the child, the question of paternity is resolved accordingly. (Evid. Code, § 895 [(now § 7554)].) By parity of reasoning, blood testing may also be dispositive of the question of maternity. Further, there is a rebuttable presumption of paternity (hence, maternity as well) on the finding of a certain number of genetic markers. (Evid. Code, § 895.5 [(now § 7555)].)" (5 Cal.4th at pp. 91-92.)

In *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198 [92 Cal.Rptr.2d 294], the child was conceived during a time when the wife was having an affair with Brian while continuing to cohabit with her husband, William. During the pregnancy, the wife left her husband and moved in with Brian, who attended the birth, was listed as father on the birth certificate and raised the child as his own. After about a year, the wife and Brian broke up, but he continued his role as father to the child. The wife then reconciled with William and tried to stop Brian from seeing the child. Brian sued to establish paternity and the trial court granted summary judgment in favor of the wife, on the ground that the conclusive presumption of section 7540 made the husband the father. *Brian C.* determined that William and Brian each had a claim to presumed father status—William on the basis of the section 7540 marital presumption, Brian under section 7611, subdivision (d), by virtue of his actions toward and relationship with the child—and found unconstitutional the trial court's conclusion that section 7540 automatically cut off Brian's rights.[10] In noting that it was not yet called upon to weigh the two presumptions against each other under section 7612, subdivision (b), the

husband and the surrogate mother to be the legal parents of the child. (*Moschetta, supra,* 25 Cal.App.4th at p. 1224.)

[10]Other courts have refused to apply the marital presumption in situations where, although the child was conceived during marriage, there remained no marital unit to protect and blood tests established another man to be the father of the child. (*Alicia R. v. Timothy M.* (1994) 29 Cal.App.4th 1232 [34 Cal.Rptr.2d 868] [marriage annulled some two years after child's

*Brian C.* court stated: "And in all likelihood DNA tests on remand will probably render that problem moot. [¶] DNA tests will certainly constitute clear and convincing evidence rebutting any of the presumptions which might favor either Brian or William. (Under subd. (a) of Fam. Code, § 7612, a presumption shown by § 7611 'may be rebutted . . . only by clear and convincing evidence.') Under section 7551, the court *may* order blood tests at *any* time on either its own motion or if suggested by any person involved in the case." (77 Cal.App.4th at p. 1222 and fn. 20, italics in original.)

*Brian C.* thus assumed what *Moschetta* held and *Johnson* suggested, that a presumption of paternity, even the "conclusive" presumption established by section 7540, would be rebutted by evidence of genetic tests demonstrating another man to be the father of the child. While *Moschetta* and *Johnson* involved *maternity* rather than *paternity*, this distinction is irrelevant to their interpretation of the relevant statutes as requiring a decision in accordance with genetic evidence where such evidence has been presented.

All three of these cases, however, involved competing claims of would-be parents who wished to raise the child: Following the biological tie did not deprive the child of a parent. The same is true of the cases described above that allowed biology to be overridden by existing familial relationships: In these cases, refusing to follow the biological tie preserved existing parent-child relationships. In the present case, by contrast, there is only one man attempting to establish presumed father status, only one man who has expressed a paternal interest in Raphael. According to appellant, Raphael's mother came to live with him at his grandmother's house during her pregnancy; she and Raphael lived with appellant there for several months after Raphael's birth; appellant cared for, provided for and played with Raphael and generally treated Raphael as his son; appellant continued to have a significant relationship with Raphael over the following years; appellant and his extended family considered Raphael appellant's son; and Raphael considered appellant his father. The trial court did not make factual findings on appellant's claim that he qualified as Raphael's presumed father under section 7611, subdivision (d), or on appellant's ability to parent Raphael at the present time. If appellant's assertions are true, however, he received Raphael into his home as an infant, openly held Raphael out as his son, had a significant relationship with Raphael and was regarded by Raphael as his father. If this is in fact the case, precluding appellant from

birth]; *County of Orange v. Leslie B.* (1993) 14 Cal.App.4th 976 [17 Cal.Rptr.2d 797] [marriage ended before child born].) In these cases, the courts refused to apply the presumption where *its* purposes of protecting the family unit would not be served and the biological father was attempting to avoid responsibility for the child. (*Leslie B., supra,* 14 Cal.App.4th at pp. 980-982.)

establishing presumed father status because of the lack of a biological tie to Raphael would defeat an existing parent-child relationship without any replacement except the dependency system.[11]

The Legislature has declared as a matter of policy that "[t]here is a compelling state interest in establishing paternity for all children." (§ 7570, subd. (a).) In its findings and declarations regarding the system for voluntary declarations of paternity, the Legislature stated: "Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights. Knowledge of family medical history is often necessary for correct medical diagnosis and treatment. Additionally, knowing one's father is important to a child's development. [¶] . . . A simple system allowing for establishment of voluntary paternity will result in a significant increase in the ease of establishing paternity, a significant increase in paternity establishment, an increase in the number of children who have greater access to child support and other benefits, and a significant decrease in the time and money required to establish paternity due to the removal of the need for a lengthy and expensive court process to determine and establish paternity and is in the public interest." (§ 7570.) "The Legislature has . . . made it perfectly clear that public policy (and, we might add, common sense) favors, whenever possible, the establishment of legal parenthood with the concomitant responsibility." (*In re Marriage of Buzzanca, supra,* 61 Cal.App.4th at p. 1423.)

Presumptive paternity based upon a man's relationship with a child under section 7611, subdivision (d), serves similar interests, albeit not the concern with knowledge of family medical history. As discussed above, the presumptive paternity statutes allow paternity to be established without direct reference to biology. Existing case law is clear that a court is not required to examine biological evidence in making a determination of paternity. (*Dawn D., supra,* 17 Cal.4th 932; *Michelle W. v. Ronald W., supra,* 39 Cal.3d 354; *Comino, supra,* 25 Cal.App.4th 678.) *Jerry P., Steven W., Kiana A., Rodney F., Susan H.,* and *Miller* all stand for the proposition that one man may be found a child's presumed father despite evidence that another is the biological father. These cases, however, did not directly discuss the statutory provisions that led *Moschetta, Johnson* and *Brian C.* to view biological

---

[11]Among the many factual issues not resolved in this case is the question when appellant learned of the existence of the dependency proceedings. Whether appellant had notice of the proceedings from early on and neglected to come forward as Raphael's father, or did not receive notice until later and came forward immediately upon receiving it, would have significant bearing on any determination whether appellant could be viewed as a presumptive father under section 7611, subdivision (d).

evidence as determinative. On the other hand, *Moschetta, Johnson* and *Brian C.*, did not directly hold that biological evidence *must* be treated as determinative regardless of the facts of a given case.

Sections 7540 and 7541 provide that even the otherwise conclusive marital presumption must give way to biological evidence: "Notwithstanding Section 7540, if the court finds that the conclusions of all the experts, as disclosed by the evidence based on blood tests performed pursuant to Chapter 2 (commencing with Section 7550), are that the husband is not the father of the child, the question of paternity of the husband *shall be resolved accordingly*." (§ 7541, subd. (a), italics added.) Section 7551 authorizes courts to order genetic testing of the mother, child and alleged father in civil actions or proceedings "in which paternity is a relevant fact." Section 7554, subdivision (a), directs that "[i]f the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly."

We are persuaded that cases such as *Jerry P., Steven W., Kiana A., Rodney F., Susan H.*, and *Miller* are correct as a matter of social policy. Moreover, while these cases at first glance appear inconsistent with the directive of section 7554 that paternity determinations be made in accordance with blood test evidence, we are not convinced that the statute requires this result in all circumstances.

The specific language of section 7554 is illuminative. Section 7554 requires the court to resolve a question of paternity in accordance with genetic tests when such tests show that the "alleged father" is not the father of the child. Similarly, section 7551 authorizes the trial court to order genetic testing for the mother, child and "alleged father." An "alleged father" is "[a] man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status . . . ." (*Zacharia D., supra,* 6 Cal.4th at p. 449, fn. 15; see *In re Shereece B.* (1991) 231 Cal.App.3d 613, 620-621 [282 Cal.Rptr. 430].) Notably, sections 7551 and 7554 do *not* refer to genetic testing of presumed fathers. Accordingly, in our view, these statutes do not authorize courts to order genetic testing of a man who meets the statutory test for presumed fatherhood. It follows that if appellant met that test, the court should not have ordered him to undergo genetic testing, much less allow the evidence of biological nonpaternity to rebut appellant's presumed father status.

Additionally, section 7551 authorizes the court to order genetic testing in "a civil action or proceeding in which paternity is a relevant fact." In the

present case, prior to the court's order and results of the blood tests, no one had suggested appellant was not Raphael's father and no other man claimed that role.[12] In such a situation, where there is a man claiming presumed father status and no indication of another man asserting paternity, we question whether paternity can rightly be considered a "relevant fact." Appellant either met the statutory test for presumed fatherhood or he did not; as noted above, proof of biological fatherhood is not a necessary component of presumed father status.

This view is in accord with that expressed in *Kiana A.* and *Jerry P.* regarding the rebuttal of presumptions of paternity under section 7612. As previously noted, *Kiana A.* focused on the language of section 7612, subdivision (a), which states that the presumptions of section 7611 " 'may be rebutted *in an appropriate action only* by clear and convincing evidence.' " (*Kiana A., supra*, 93 Cal.App.4th at p. 1118, italics added in *Kiana A.*) *Kiana A.* read this language to indicate that "although the results of genetic testing constitute clear and convincing evidence, it does not follow that such evidence will rebut the presumption in every case. Rather, the statute seeks to protect presumptions of paternity, once they have arisen, from being set aside except upon clear and convincing evidence and only in an appropriate case. [¶] . . . [A]s between two men, both of whom qualify as presumptive fathers, biological paternity does not necessarily determine which presumption will prevail under section 7612." (93 Cal.App.4th at pp. 1118-1119.) In a case such as the present, where there is only one man asserting paternity, the case for refusing to make the results of genetic testing determinative in every case is even stronger. (See *Jerry P., supra*, 95 Cal.App.4th at p. 804.)[13]

We can discern no policy that would support a requirement of failing to legally recognize a man who has acted as a child's only father, regardless of

---

[12]The Department suggests in its answer to the petitions for rehearing that three different men were named as possible fathers for Raphael. The record does contain references to three different fathers' names for Raphael, but it is not clear that these names actually referred to different men. The documents concerning the initial dependency petition listed Raphael's father as Curtis T., but listed his address as "c/o Yolanda B[.]"—appellant's mother—at appellant's Duke Court address. On the subsequent petition filed November 12, 1999, Raphael's father was listed as Romear P., "c/o Yolanda B[.]" at her Taylor Street address. The Social Security number listed for Romear P. in connection with this petition was the same as the Social Security number subsequently listed for appellant in a November 18 addendum. The court's minutes for November 19, 1999, again list the father as Curtis T., and a posthearing notice was mailed to Curtis T. at appellant's Duke Court address. Court minutes for December 6, 1999, listed the father as Romear P., with the posthearing notice mailed to Romear P. at appellant's Duke Court address. The Department's January 2000 report used appellant's correct name, though the court's minutes for the next hearing again listed the father as Romear P. From February 2000 on, the court's minutes listed appellant's name as the father.

[13]We do not find it necessary to determine precisely what circumstances would render a case "appropriate" for rebuttal under section 7611, subdivision (a). In the present case, we are

his relationship with the child and desire to accept paternal responsibility, solely because he is determined not to be the biological father. Neither the presumed father statutes nor those governing use of genetic tests to determine paternity were developed for use in the dependency context. The presumed father statutes are part of the Uniform Parentage Act (Fam. Code, § 7600 et seq.), which was enacted "to eliminate the legal distinction between legitimate and illegitimate children," replacing "the distinction between legitimate and illegitimate children with the concept of the 'parent and child relationship.'" (*Johnson, supra,* 5 Cal.4th at pp. 88-89.) Whatever role genetic testing may play in resolving disputes between competing would-be fathers, or confirming the financial obligations of fathers who might prefer to ignore their roles, we fail to see what purpose is served by using genetic testing to defeat an existing father-child relationship when there is no biological father seeking to assume care, support and nurturance of the child. In the present case, appellant does not seek to interfere with another man's claim of paternity. If appellant's assertions are true and if he is presently fit to parent Raphael, allowing appellant to take custody of the boy with whom he has shared a parent-child relationship would only recognize the reality of appellant's role in Raphael's life.[14] The matter must be remanded for the trial court to determine whether appellant meets the statutory definition of a presumed father.

## II.

Appellant and Raphael additionally urge appellant was entitled to presumed father status by virtue of having executed a voluntary declaration of paternity when Raphael was born. Section 7571, subdivision (a), provides: "[U]pon the event of a live birth, prior to an unmarried mother leaving any hospital, the person responsible for registering live births under Section 102405 of the Health and Safety Code shall provide to the natural mother

---

faced only with the question whether rebuttal of presumptive paternity by biological proof of nonpaternity is "appropriate" when no other man claims paternity.

[14]We recognize that our analysis, which permits the trial court to determine that a case is *not* appropriate for resolution in accordance with genetic evidence (§§ 7551, 7612), might appear to render the section 7611 rebuttable presumptions more conclusive than the expressly "conclusive" section 7540 marital presumption, which is rebuttable by blood test evidence. While the section 7540 presumption may be rebutted by evidence of blood tests proving the husband is not the father, however, the circumstances in which this may occur are limited: A motion for blood testing must be filed no later than two years from the date of the child's birth, and only by the husband, the presumed father or child (for purposes of establishing paternity), or the mother (if the biological father has filed an affidavit acknowledging paternity). (§ 7541, subds. (b), (c).) By contrast, the section 7611 presumptions are rebuttable in broader circumstances: Section 7612 does not prescribe either a time limitation for when the presumption can be rebutted, a restriction on who can seek to rebut it, or a requirement for the type of rebuttal evidence (although it must be clear and convincing).

and shall attempt to provide, at the place of birth, to the man identified by the natural mother as the natural father, a voluntary declaration of paternity together with the written materials described in Section 7572. Staff in the hospital shall witness the signatures of parents signing a voluntary declaration of paternity and shall forward the signed declaration to the Department of Child Support Services within 20 days of the date the declaration was signed. A copy of the declaration shall be made available to each of the attesting parents." If the declaration is not registered by the person responsible for registering live births at the hospital, "it may be completed by the attesting parents, notarized, and mailed to the Department of Child Support Services at any time after the child's birth." (§ 7571, subd. (d).) "Except as provided in Sections 7575 [recission or motion to set aside declaration], 7576 [effect of declaration made on or before December 31, 1996], and 7577 [effect of minor's declaration], a completed voluntary declaration of paternity, as described in Section 7574 [form requirements], that has been filed with the Department of Child Support Services shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction. The voluntary declaration of paternity shall be recognized as a basis for the establishment of an order for child custody, visitation, or child support." (§ 7573.)

No voluntary declaration of paternity is included in the record in this case. Appellant stated in his declaration in the trial court that "[a]t the hospital, I wanted to be put on the baby's birth certificate as the father. I believe I and Neimaha were given a form to sign to say that I was the baby's father. I signed it." Moreover, appellant and Raphael argue that the appearance of appellant's name as the father on Raphael's birth certificate, which does appear in the record, proves appellant signed the voluntary declaration of paternity. Health and Safety Code section 102425, which sets forth the information required to be included in a birth certificate, provides: "If the parents are not married to each other, the father's name shall not be listed on the birth certificate *unless the father and the mother sign a voluntary declaration of paternity at the hospital before the birth certificate is prepared.* The birth certificate may be amended to add the father's name at a later date only if paternity for the child has been established by a judgment of a court of competent jurisdiction or by the filing of a voluntary declaration of paternity." (Italics added; see 42 U.S.C. 666(a)(5)(D)(i).)

Appellant and Raphael argue, as appellant did in the trial court, that since Health and Safety Code section 102425 prohibits listing an unmarried father on the birth certificate absent a signed voluntary declaration of paternity, the fact that his name appears on the birth certificate demonstrates he in fact signed the certificate. The trial court seemed to accept this logic, acknowledging that appellant "said he signed one in the hospital, and the name on

the birth certificate indicates he probably did." The trial court rejected the argument, however, because there was no evidence that the voluntary declaration of paternity was filed with the Department of Child Support Services as required by section 7573 for the voluntary declaration of paternity to have the force of a judgment of paternity.

In our original opinion, we upheld the trial court's determination on the theory that appellant, as the party seeking to establish presumed father status, had the burden of providing evidence to support the presumption upon which he relied. In petitions for rehearing, appellant and Raphael contend that our conclusion ignored the effect of Evidence Code section 664. Evidence Code section 664 provides: "It is presumed that official duty has been regularly performed . . . ." "This presumption 'affect[s] the burden of proof' (Evid. Code, § 660), meaning that the party against whom it operates . . . has 'the burden of proof as to the nonexistence of the presumed fact. (Evid. Code, § 606 . . .)" (*People v. Martinez* (2000) 22 Cal.4th 106, 125 [91 Cal.Rptr.2d 687, 990 P.2d 563].)

As described above, section 7571, subdivision (a), provides that hospital staff "shall witness the signatures of parents signing a voluntary declaration of paternity and *shall forward the signed declaration to the Department of Child Support Services within 20 days of the date the declaration was signed.*" This statute imposes an official duty on hospital staff to forward signed voluntary declarations of paternity for filing. Accordingly, once appellant provided prima facie proof that he signed a voluntary declaration of paternity, as he did by showing his name was on the birth certificate, he was entitled to rely upon the presumption of Evidence Code section 664 to establish that the document was properly filed, and it was the Department's burden to disprove this fact.

In its answer to the petitions for rehearing, the Department argues any presumption established under Evidence Code section 664 was rebutted. It points to the "paternity inquiry" issued by the trial court to the district attorney's office, which inquired whether paternity had previously been declared by a court order or judgment. The district attorney's office replied: "No case opened for this child." According to the Department, this evidence demonstrates that appellant did *not* complete a voluntary declaration of paternity because if he had done so, the district attorney's office would have opened a support case. While the Department's assumption is logical enough, it is only an assumption and not proof. Had the trial court recognized the application of Evidence Code section 664 on this issue, it could have made a factual determination whether the evidence was sufficient to rebut the presumption that a signed and filed voluntary declaration of

paternity existed. On remand, the trial court will have an opportunity to reconsider this issue as well.[15]

The judgment is reversed and the matter remanded for proceedings consistent with the views expressed herein.

Lambden, J., and Ruvolo, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 19, 2002. Kennard, J., did not participate therein.

---

[15]Counsel for Raphael additionally argues that the trial court erred in failing to determine, once appellant appeared in the proceedings, whether he had executed a voluntary declaration of paternity. In dependency proceedings, the court is required, at the detention hearing or "as soon thereafter as practicable," to inquire of the mother and other appropriate persons "as to the identity and address of all presumed or alleged fathers." (Welf. & Inst. Code, § 316.2, subd. (a); Cal. Rules of Court, rule 1413.) Certain specific issues are enumerated to be included in this inquiry, "as the court deems appropriate," including "[w]hether any man has formally or informally acknowledged or declared his possible paternity of the child, including by signing a voluntary declaration of paternity." (Welf. & Inst. Code, § 316.2, subd. (a)(5); see Cal. Rules of Court, rule 1413(b)(5).) Here, the trial court apparently failed to inquire whether a voluntary declaration of paternity had been executed and filed, although it did issue a "paternity inquiry" to the district attorney's office inquiring whether paternity had been previously declared by a court order or judgment. In light of our discussion of the effect of Evidence Code section 664 above, we do not find it necessary to further address this issue.