Filed 8/22/17
*See Concurring and Dissenting Opinion*

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E066818 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1400345) |
| v. | OPINION |
| D.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Harry (Skip) A. Staley, Judge. (Retired judge of the Kern Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Reversed with directions.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman, and Carole Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

"Principles of due process require that the juvenile court not terminate a presumed father's parental rights without first finding, by clear and convincing evidence, that the father is unfit." (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1205 (*G.S.R.*).) In this dependency appeal, D.H., Sr. (father), the presumed father of D.H., argues the juvenile court violated due process by terminating his parental rights without making an unfitness or detriment finding against him by clear and convincing evidence at any point in the proceedings.

Beginning with *In re Gladys L.* (2006) 141 Cal.App.4th 845 (*Gladys L.*), appellate courts have held juvenile courts must make a parental unfitness or detriment finding by clear and convincing evidence before terminating the rights of noncustodial, nonoffending fathers. As we explain *post*, the court's termination of father's rights violated this important constitutional safeguard because at no point in this dependency was it either "alleged []or proven that [he] was an unfit parent." (*Id*. at p. 847.) Here, D.H. was removed from, and failed to reunify with, his paternal grandparents, who had been caring for him under a probate guardianship. The entire case, from the petition, to removal, to termination of services, focused on the grandparents, not father.[1] Nevertheless, at the permanency planning hearing, the court terminated father's parental rights. *Gladys L.* and its progeny require us to "reverse the order terminating [father's]

_____

[1] A "nonoffending" parent is one who has not been the subject of a jurisdictional finding under Welfare and Institutions Code section 300. (E.g., *In re A.A.* (2012) 203 Cal.App.4th 597, 606.) Father is nonoffending because the court did not sustain any jurisdictional allegations against him.

parental rights and remand for reconsideration whether a proper basis for such termination exists." (*G.S.R.*, *supra*, 159 Cal.App.4th at p. 1205.)

Respondent Riverside Department of Social Services (DPSS) urges us to depart from *Gladys L.* and adopt in the dependency context the best interest of the child standard for terminating parental rights under Probate Code section 1516.5. (See *In re Guardianship of Ann S.* (2009) 45 Cal.4th 1110 [upholding best interest standard in Probate Code section 1516.5 as constitutional].) We decline to make this radical change. Probate Code section 1516.5 applies when *a legal guardian* seeks to have the child declared free from the custody and control of one or both parents and was designed to "mak[e] it easier for children in probate guardianships *to be adopted by their guardians*." (*In re Guardianship of Ann S.*, at p. 1118, italics added.) That provision does not apply in a case like this, where the only reason the court is considering terminating parental rights is because the state brought a successful dependency action *against* the guardians. Father's entitlement to the constitutional safeguards articulated in *Gladys L.* does not vanish simply because D.H. was under a legal guardianship at the outset of the dependency.

# I

## FACTUAL BACKGROUND

A.    *The Petition Against the Grandparents*

D.H. was born in 2008.  He is the son of J.S. (mother) and father, who never married.[2]  P.F. (grandmother) and A.F. (grandfather) are D.H.'s paternal grandparents.  According to the detention report, they became his legal guardians in February 2010 under a probate court order.  The record contains no other information regarding the circumstances of the guardianship.

In March 2014, DPSS received a referral alleging the grandparents were neglecting D.H.  According to the referral, "drug activity takes place in the garage of the home," where father and his girlfriend reportedly resided.  The referral also reported father had a history of drug-related arrests and domestic violence.  When the social worker interviewed the grandparents, they said father had been living in their garage "off and on."  The social worker asked the grandparents to drug test.  Grandfather tested

---

[2]  Although the appellate record does not contain a paternity finding, the parties agree father is the presumed father.  The court referred to him as such at hearings, and the Welfare and Institutions Code section 366.26 reports state the court found him to be the presumed father on May 7, 2015.  Additionally, he is listed as the father on D.H.'s birth certificate, which indicates mother and father signed a voluntary declaration of paternity.  (See Fam. Code, § 7611 [a voluntary declaration of paternity executed after Jan. 1, 1997 allows the male signatory to have presumed father status in dependency proceedings]; Cal. Rules of Court, rule 5.635(c); Health & Saf. Code, § 102425, subd. (a)(4)(C) [unwed father's name shall not be listed on birth certificate unless parents "sign a voluntary declaration of paternity at the hospital before the birth certificate is submitted for registration"]; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 738.)

negative.  Grandmother could not produce enough saliva to test, and ultimately admitted she had taken methamphetamine the night before.  She said father's girlfriend had given it to her and it was the first time she had ever taken the drug.  The social worker asked grandfather if he knew about grandmother's drug use and he replied, "I plead the fifth on that."

DPSS took D.H. into protective custody and filed a dependency petition alleging he fell under section 300, subdivision (b)[3] (failure to protect).  The petition alleged grandmother abused methamphetamine in the home and was under the influence while caring for D.H.  It also alleged the grandparents allowed father and his girlfriend to reside in the garage when they "knew or reasonably should have known that they both abuse controlled substances and engage in domestic violence disputes."  Although the detention report and petition referenced father, the petition contained no allegations against him.[4] All of the petition's allegations concerned the grandparents' ability to care for D.H.

At the detention hearing, the court found DPSS had made a prima facie showing D.H. fell within section 300, subdivision (b) based on grandmother's admitted methamphetamine use, as well as on the grandparents' failure to protect D.H. from father

---

**3** Unlabeled statutory citations refer to the Welfare and Institutions Code.

**4** The detention report said DPSS had received five neglect referrals during the first year or so of D.H.'s life.  Some of those referrals were against both mother and father and some solely against mother.  DPSS ultimately determined two of those allegations were substantiated, both against mother—that she had tested positive for amphetamine upon giving birth to D.H. and for methamphetamine upon being admitted to San Bernardino Community Hospital for mental health issues about a year later.  The record contains no prior substantiated referrals against father.

and his girlfriend's "possible" substance abuse. The court removed D.H. from the grandparents' custody and ordered alcohol and drug-related services for grandmother and parenting education services for grandfather. It ordered supervised visits with the grandparents so long as grandmother took a drug test before each visit.

B.     *Removal from Grandparents' Custody*

During a subsequent interview, grandmother reiterated her methamphetamine use was a "one time thing." She said she began caring for D.H. when he was only a few months old and ultimately sought legal guardianship over him because mother did not want to take care of him. The grandparents had not seen mother in several years. When the social worker contacted mother (who is not a party to this appeal), she reported she was struggling with substance abuse and bipolar disorder and had not had any interaction with her son for two years.

D.H. told the social worker he felt safe in the home and enjoyed spending time with father. He said he slept in his own bedroom and father slept in the garage. When he wanted to play, he would knock on the garage door and father and his girlfriend would come into the grandparents' house and watch television with him or play with him. D.H. said everyone in the home got along well, except sometimes he could hear father and his girlfriend yelling at each other and sometimes the girlfriend hit father.

Grandmother said father was good with D.H. and she trusted him to care for his son. She said he would take D.H. on outings to "Chuck E. Cheese, Castle Park or the

6

park." She said father no longer lived with them, however, and she did not know where he was.

By the filing of the jurisdiction/disposition report, father's whereabouts were unknown. Given the March 2014 referral, the social worker was concerned he might struggle with substance abuse and domestic violence. A search of his criminal history turned up a misdemeanor conviction for child cruelty in 1996 and two misdemeanor drug convictions in 2013.

Father appeared at the initial jurisdiction and disposition hearing in April 2014, but did not attend the continued hearing in May. The court found the allegations against the grandparents true by a preponderance of evidence. It also found it necessary under section 361, subdivision (c)(1) to remove D.H. from their custody. The court ordered DPSS to provide family reunification services to the grandparents and approved their case plan, which prohibited them from using drugs, allowing drug use in the home, and allowing father to reside in the garage.

C.     *The Grandparents' Unsuccessful Reunification Period*

During the six-month review period, the social worker reported the grandparents were complying with their case plan and visits were going well. D.H. enjoyed spending time with them and "very much want[ed] to return to their home." Grandmother tested negative for drugs four times. At the review hearing in November 2014, the court expanded the grandparents' visits to include unsupervised overnights and weekends, and found a substantial probability D.H. could be returned to their care within six months.

Unfortunately, things took a turn for the worse during the 12-month review period. In October 2014, the social worker learned through D.H. that the grandparents had been violating their case plan by allowing father to live in their garage and spend time with D.H., unsupervised. The social worker told the foster family to reduce the grandparents' visitation, but apparently the foster family did not do so.

Months later, in February 2015, D.H. told the social worker he saw father at the grandparents' house every weekend. D.H. thought father was living there because he slept on a couch in the garage and stored his personal belongings there. D.H. said the grandparents had told him not to tell anyone father was sleeping in their garage.

Father's whereabouts were still unknown at this point. The social worker wrote in the 12-month review report that she had not had contact with him and was "unaware of his current living status, employment status, how he is supporting himself, his relationship status, or any other circumstances." The only information she had learned about father was he had been discharged from a substance abuse outpatient program in March 2015 for exceeding the limit of allowable absences and thus had a warrant for "failure to follow through with drug diversion."

The report recommended terminating the grandparents' services. The social worker cited their lack of judgment in allowing father unsupervised access to D.H. in violation of their case plan and the fact they "coach[ed D.H.] to lie to his caregiver and the Department about his father residing in their garage."

8

At the 12-month review hearing in June 2015, the court found the grandparents had failed to benefit from services and lacked insight. The court terminated the grandparents' services, found returning D.H. to their care would be detrimental to the child's welfare, and set a section 366.26 hearing to determine his permanent plan.

D.     *Termination of Father's Parental Rights*

Father's whereabouts were still unknown when DPSS filed its 366.26 report in September 2015. The report recommended adoption and requested time to identify a prospective adoptive home. The report also recommended termination of *parental* rights, on the ground the bond between D.H. and his parents was "minimal."

In an addendum report, DPSS informed the court it had recently talked to father. He had given the social worker his current address in Riverside and reported he had not been living at the grandparents' house for at least a year. He was working in construction, specializing in bathroom and kitchen remodels. He said he had enrolled in a drug treatment program five months earlier, but was unable to complete it due to work and transportation difficulties. Likewise, he had not been in contact with DPSS because he had been overwhelmed, but he wanted to know what he needed to do to "get his child back." The social worker told him he could attend the upcoming November 2015 hearing and ask the court to appoint him an attorney.

Father attended the hearing and the court appointed him counsel. About two months later, the court found adoption was in D.H.'s best interest and terminated the grandparents' guardianship over the child.

9

DPSS placed D.H. in a prospective adoptive home in December 2015. In a January 2016 addendum report, DPSS informed the court it was concerned about the prospective adoptive parents' commitment level and unrealistic expectations for D.H. DPSS placed D.H. in a new prospective adoptive home in March 2016. In May, DPSS placed him in another prospective adoptive home, following two all-day and two overnight visits with the family. DPSS reported the family was "loving and open to [D.H.]" and D.H. wanted to be adopted by them.

That same month, father attended a hearing and asked the court for permission to visit D.H. The court replied he was allowed monthly visits under an existing order. DPSS added it wanted to hold off on visits with father for at least a month to allow D.H. time to settle into his placement.

In a July 2016 addendum report, DPSS informed the court that D.H. had "adjusted positively" in his prospective adoptive home and that it was continuing to recommend termination of parental rights. Although D.H. had only been living with the prospective adoptive family for a few months, he appeared happy in the home. The prospective adoptive parents had three children of their own who were excited about the adoption.

On July 25, 2016, father called DPSS and provided his current address in Jurupa Valley. Father then attended the section 366.26 hearing in August 2016 and objected to DPSS's recommendation to terminate his parental rights. He asked the court to establish a legal guardianship over D.H. instead of proceeding with adoption and argued he shared the type of bond with D.H. described in section 366.26, subdivision (c)(1)(B)(i),

10

commonly referred to as the "parental benefit exception" to terminating parental rights. DPSS argued for adoption and termination of parental rights, arguing father's visitation had been "inconsistent throughout the dependency."

The court terminated father's parental rights, stating: "A sufficient basis for termination of parental rights exist[s] based upon findings made at the jurisdiction [and] dispositional hearing. At that hearing the mother and father were not offered services as they are not entitled pursuant to [Welfare and Institutions] Code 361.5(a). Termination of parental rights would not be detrimental to the minor in that none of the exceptions set out in Welfare and Institutions Code 366.21(c)(1), (a) and/or (b) apply in this case." In relevant part, section 361.5, subdivision (a) requires a court to provide reunification services to presumed fathers except "upon the establishment of an order of guardianship pursuant to Section 360."

Section 360 guardianships occur when a parent informs the juvenile court he or she is not interested in services after the child has been declared a dependent. (§ 360, subd. (a).) "The proceeding for the appointment of a [section 360] guardian shall be in the juvenile court." (*Ibid.*) Although the record is bereft of information regarding the grandparents' appointment as guardians, D.H.'s could not have been a section 360 guardianship because the grandparents were appointed guardians in probate court long before D.H. became a dependent. The juvenile court seems to have been under the mistaken impression D.H.'s guardianship was established under section 360.

Father timely appealed the termination of his parental rights.

11

# II

## DISCUSSION

A.     *Father Did Not Forfeit His Argument*

Before turning to the merits, we address DPSS's contention father forfeited his due process argument by failing to raise it with the juvenile court.  A party forfeits a claim of error on appeal when he or she fails to raise the objection in the trial court; however, "application of the forfeiture rule is not automatic."  (*In re T.G.* (2013) 215 Cal.App.4th 1, 14.)  When a party raises an important constitutional argument like the one father raises here regarding his due process interest in the care and custody of his son, we exercise our discretion to consider the argument on its merits.  (*Id.* at pp. 13-14 [refusing to apply forfeiture doctrine to the father's claim his due process rights were violated when the court terminated his parental rights without a finding of unfitness or detriment]; accord, *Gladys L.*, *supra*, 141 Cal.App.4th at p. 849, *Frank R.* (2011) 192 Cal.App.4th 532, 539 (*Frank R.*).)  We therefore decline DPSS's invitation to dismiss the appeal on forfeiture grounds.  "Because father has raised a question of law, we review the claimed constitutional violation de novo."  (*In re T.G.*, at p. 14.)

B.     *Due Process Requires a Detriment Finding*

*Gladys L.*, the foundational California case on presumed fathers' constitutional protections against termination of their parental rights, explains:  "Parents have a fundamental interest in the care, companionship, and custody of their children.  (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 [71 L.Ed.2d 599, 102 S.Ct. 1388] (*Santosky*).)

12

*Santosky* establishes minimal due process requirements in the context of state dependency proceedings. 'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations *by at least clear and convincing evidence*.' [Citation.] . . . '[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.'" (*Gladys L.*, *supra*, 141 Cal.App.4th at p. 848, italics added.)

Gladys, the minor in the appeal, had become a dependent of the juvenile court while in her mother's custody. (*Gladys L.*, *supra*, 141 Cal.App.4th at p. 847.) At the detention hearing, the department said it might amend the section 300 petition to assert allegations against the presumed father, but it never did so. (*Gladys L.*, at p. 847.) Like here, Gladys's presumed father "disappeared" after the detention hearing, and was not involved in the proceedings for the next three years. (*Ibid.*) He reappeared at the section 366.26 hearing and requested visits with Gladys. The juvenile court found it was not in the child's best interest to have contact with him and terminated his parental rights. (*Gladys. L.*, at p. 847.)

The *Gladys L.* court reversed the termination order, observing the case had not progressed like the typical dependency where, by the time of termination, the juvenile court had already "made *prior* findings that the parent was unfit." (*Gladys L.*, *supra*, 141 Cal.App.4th at pp. 848-849, quoting *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254 (*Cynthia D.*), italics added.) Such prior findings, the court explained, "'are *necessary*

13

*preconditions to termination* [and] convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.'" (*Gladys L.*, at p. 848, italics added.) Indeed, the California Supreme Court described these prior findings of parental unfitness as "[t]he linchpin to the constitutionality of the section 366.26 hearing" because they "ensure '*the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.*'" (*Ibid.*, quoting *Cynthia D.*, at p. 256, some italics added.)

Gladys's dependency was not like the typical dependency in that regard because "DCFS never alleged that [the father] was unfit and the trial court never made that finding." (*Gladys L.*, *supra*, 141 Cal.App.4th at p. 848.) The *Gladys L.* court concluded the juvenile court had "ignored" the "requirements of *Santosky* and the safeguards embedded in the California dependency scheme" by terminating the father's rights without having found he was unfit based on clear and convincing evidence *at some point in the dependency*. (*Id*. at pp. 848-849.)

Thus far no appellate decision has disagreed with the holding in *Gladys L.* and many have followed it. (See, e.g., *In re T.G.*, *supra*, 215 Cal.App.4th at pp. 23-24; *G.S.R.*, *supra*, 159 Cal.App.4th 1202, 1211; *Frank. R.*, *supra*, 192 Cal.App.4th at p. 537; *Z.K.* (2011) 201 Cal.App.4th 51, 64-65 (*Z.K.*).) For example, in *Frank R.*, the appellate court reversed an order terminating a nonoffending, noncustodial presumed father's

14

parental rights on the ground the juvenile court had never made a finding of unfitness or detriment against him. (*Frank R.*, at p. 534.) The department had named the father in some of the petition's allegations, but the juvenile court ultimately dismissed those allegations. (*Id*. at p. 535.) Much like in our case, the father's contact with his children over the ensuing two years was "irregular and infrequent," and there were "long periods of time without contact at all." (*Id.* at pp. 535-536.) The father lived in a motel for the whole dependency, and as a result, had declined services and never requested custody. (*Id.* at p. 536.) Despite the father's absence from his children's lives and failure to request custody during the dependency, the *Frank R.* court held "the juvenile court failed to meet the *Santosky* requirements and overlooked the safeguards established by the California dependency scheme because the court never made a finding [he] was unfit, having never made a finding of detriment by clear and convincing evidence with respect to [him]." (*Id.* at p. 538.) The court remanded the case to the juvenile court "to determine whether, based upon the facts as they exist, a finding of unfitness may be made by clear and convincing evidence." (*Id.* at p. 540.)

"*Gladys L.*, *Frank R.*, and [their progeny] teach that a court may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights without finding, by clear and convincing evidence, that awarding custody to the parent would be detrimental." (*In re T.G.*, *supra*, 215 Cal.App.4th at p. 20.) The finding need not occur at the section 366.26 hearing; "due process is satisfied if unfitness is established at an earlier stage, and parental rights terminated later based on the child's best interest." (*In*

15

*re Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1134, citing *Cynthia D.*, *supra*, 5 Cal.4th at p. 256 and *Santosky*, *supra*, 455 U.S. at p. 760.)

Thus, at minimum, a juvenile court must make a detriment finding against a presumed father before terminating his rights. The finding may be made at the dispositional stage or during a subsequent review period, but it must occur prior to termination. "'California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to *[the] parent* would be detrimental to the child.'" (*Frank. R.*, *supra*, 192 Cal.App.4th at p. 537, italics added.) This finding must be based on clear and convincing evidence. (*Id.* at p. 538)

No such finding occurred in this case. At no stage in D.H.'s dependency did DPSS allege, or the juvenile court find, that father was an unfit parent or that awarding him custody of D.H. would be detrimental to the child. All of the allegations in the petition, as well as the court's jurisdictional and dispositional findings, concerned the grandparents. While it included information about father in its reports, DPSS was never held to the standard of presenting clear and convincing evidence of father's ability to parent D.H. As a result, father has been deprived of the "minimal due process requirement" articulated in *Santosky* and applied in *Gladys L.*—the state must have at least clear and convincing evidence of parental unfitness before it may "sever completely and irrevocably the rights of parents in their natural child." (*Santosky*, *supra*, 455 U.S. at pp. 747-748.)

16

The juvenile court terminated father's parental rights based on its belief it had denied him services under section 361.5, subdivision (a) due to the existence of a section 360 guardianship and its finding termination would not be detrimental to D.H. In fact, the court never denied father services because it never considered whether to grant him services in the first place. If it had, section 361.5, subdivision (a) would not have supplied authority to deny services because D.H.'s guardianship was not under a section 360 guardianship. Thus, the sole basis for the court's decision to terminate father's parental rights was a best interest of the child analysis, which *Gladys L.* and its progeny make clear is insufficient. (*Gladys L.*, *supra*, 141 Cal.App.4th at p. 847; accord, *Frank R.*, *supra*, 192 Cal.App.4th at p. 538; *Z.K.*, *supra*, 201 Cal.App.4th at p. 63; *G.S.R.*, *supra*, 159 Cal.App.4th at p. 1205.) Because the court made no findings against father, let alone findings based on clear and convincing evidence, due process requires we reverse the termination order.

DPSS argues section 366.26 does not require a finding of unfitness or detriment before a court may terminate parental rights. The court rejected this same argument in *Z.K.*, a more recent case applying the *Gladys L.* holding to a mother's constitutional interest in the care and custody of her child. The *Z.K.* court concluded the contents of section 366.26, a statutory provision, were "hardly determinative of whether mother's *constitutional* rights were violated by the termination of her parental rights." (*Z.K.*, *supra*, 201 Cal.App.4th at p. 66.) We agree. *Gladys L.* makes clear the source of the

detriment finding requirement is the Constitution, not the Welfare and Institutions Code. (*Gladys L.*, *supra*, 141 Cal.App.4th at pp. 847-849.)

Next, DPSS argues *Gladys L.'s* analysis is "potentially faulty" because the court relied on *Santosky* and *Cynthia D.*, which address termination of the rights of presumed parents *from whom the minors had been removed*, not of parents who had never had custody, like father here. Courts have rejected this argument as well. For example, in *Z.K.*, the court explained: "[F]rom a constitutional perspective, it was exactly *because* [the nonoffending, noncustodial parent] was *not involved in the earlier stages of the proceeding* that a specific finding of detriment was needed before her rights were terminated at the section 366.26 hearing . . . [T]he only reason the termination of parental rights at a section 366.26 hearing in a typical dependency proceeding is constitutional is because of the findings that have necessarily been made as to the parent at earlier stages of the proceeding. Here, no such findings were made as to mother because *her whereabouts were unknown and she was not a subject of the earlier stages* . . . [M]other 'was not the custodial parent, the child was not removed from her custody and she was not denied placement [at the dispositional hearing].' Thus, to terminate her parental rights at the section 366.26 hearing over her request for custody, a specific finding of detriment, supported by clear and convincing evidence, had to be made." (*Z.K.*, *supra*, 201 Cal.App.4th at p. 66, italics added.) Again, we agree with the reasoning in *Z.K.*

18

DPSS argues in the alternative, if an unfitness or detriment finding is required, we can infer one from the record. For obvious due process reasons, appellate courts refuse to make such an important finding in the first instance. Even in cases where there may have been "valid bases" for the juvenile court to have found a father unfit, appellate courts will not infer such a finding as it requires them "'to act as petitioner and fact finder, thereby denying [the father] an opportunity for notice of specific charges and an opportunity to respond to the charges against him.'" (*Frank R.*, *supra*, 192 Cal.App.4th at p. 539, quoting *Gladys L.*, *supra*, 141 Cal.App.4th at p. 848.)

We are aware of only one case where the appellate court inferred a detriment finding to support a termination order when the juvenile court had made no findings against the father during the dependency. In *In re G.P.* (2014) 227 Cal.App.4th 1180 (*G.P.*), the father's counsel had argued at the permanency planning hearing that the juvenile court was not required to make a detriment finding before terminating parental rights. (*G.P.*, at pp. 1194-1195.) On appeal, the father argued the lack of any detriment finding violated due process. The appellate court concluded even if his counsel had not invited the error, it could infer a detriment finding based on the fact he never had a relationship with his children, was currently serving a lengthy prison sentence in Indiana, and was likely to be deported upon his release. (*Id.* at p. 1196.)

Even if we were inclined to overlook the due process concerns expressed in cases like *Gladys L.* and *Frank R.*, we would nevertheless refuse to infer a detriment finding on this record. Here, father did not invite the failure to make a detriment finding. And, unlike the father in *G.P.*, father *does* have a relationship with D.H. and there is evidence the relationship is positive. D.H. reported he liked spending time with father, and grandmother said father was good with D.H. and would take him on various outings. Additionally, father is not incarcerated and therefore physically incapable of raising his son like the father in *G.P.* was. As of October 2015, father reported he was employed and had stable housing.

We are sympathetic to DPSS's concern that father has not shown much initiative or parental responsibility during the dependency proceedings thus far. Despite being aware of DPSS's involvement in his son's life, he failed to appear at several hearings, and failed to complete a drug treatment program unrelated to the dependency. This evidence does raise questions about his fitness as a parent. However, the statements about father in DPSS's reports do not constitute clear and convincing evidence he is unfit or it would be detrimental to D.H. to place the child in his custody.

"At a minimum," a presumed father is "entitle[d] to an opportunity to defend himself against a factually specific charge that he is not." (*G.S.R.*, *supra*, 159 Cal.App.4th at p. 1214.) "It is not up to [the father] to prove he is a fit parent. Rather, it is up to [the department] to satisfy its constitutional burden to establish, by clear and convincing evidence, that he is not." (*Id.* at pp. 1214-1215.) "[A]lthough there may be

20

valid bases for the juvenile court to make a finding of father's unfitness, the [juvenile] court never made that finding, . . . [and w]e may not make that finding here or infer such a finding." (*Frank R.*, *supra*, 192 Cal.App.4th at p. 539.) As far as we can tell, father's last drug conviction was a misdemeanor from 2013. Because factual findings are the province of the juvenile court, we refuse to draw any conclusions about father's parental fitness from this limited appellate record.

Finally, DPSS argues the California Supreme Court's 2009 companion probate decisions *In re Guardianship of Ann S.* and *In re Charlotte D.* (2009) 45 Cal.4th 1140 (*Charlotte D.*) indicate a detriment analysis was unnecessary and all that due process required was a best interest analysis. In those two cases, our high court addressed the constitutionality of Probate Code section 1516.5, which authorizes a probate court to terminate parental rights when a guardianship has continued for at least two years and the court finds adoption by the guardian would be in the child's best interest. Probate Code section 1516.5 "mak[es] it easier for children in probate guardianships to be adopted by their guardians" because, formerly, guardians had to show one of the exceptions in Family Code section 7822 et seq. applied if they wanted to adopt without the consent of the child's parents. (*In re Guardianship of Ann S.*, *supra*, 45Cal.4th at p. 1118.)

In both cases, the probate court had terminated parental rights under Probate Code section 1516.5 upon finding that adoption was in the child's best interest. The parents appealed, arguing the provision was unconstitutional for failing to require the court to make an unfitness or detriment finding before terminating parental rights. (*In re*

21

*Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1127; *Charlotte D.*, *supra*, 45 Cal.4th at p. 1147.)  The court concluded a best interest analysis was a sufficient precursor to terminating parental rights in the typical Probate Code section 1516.5 case.  It based this conclusion on the fact Probate Code section 1516.5 applies to parents who have already relinquished their custodial responsibilities for two years while the child and guardian developed interests in a stable placement and the child's care and custody.  (*In re Guardianship of Ann S.*, at p. 1118.)  The court emphasized its holding was "a narrow one, limited to [the] contention that due process demands a finding of parental unfitness at a [Probate Code] section 1516.5 hearing."  (*Id*. at p. 1135.)

Despite this caveat, DPSS asks us to extend that holding to the termination of parental rights in a dependency setting.  We refuse to do so because the circumstances in dependencies are so different from probate adoption proceedings.  As the court noted in *In re Guardianship of Ann S.*, Probate Code section 1516.5 was intended to facilitate *the adoption process for guardians* who have cared for a child for more than two years, in situations where the parents have "failed to exercise any custodial responsibility for [that] period."  (*In re Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1118.)  In such cases, "the child develops an interest in a stable, continuing placement, and *the guardian* acquires a recognized interest in the care and custody of the child" precisely because the guardianship has proceeded successfully for a two-year period.  (*Ibid.*, italics added.)

By contrast, in this particular dependency, the guardianship did not proceed successfully but instead necessitated state intervention, followed by removal and foster

22

care.  Unlike a Probate Code section 1516.5 case, D.H. had not been in a successful guardianship for a two-year period when the court terminated father's parental rights. Instead, the child had been in a prospective adoptive home for three months.  As a result, the particular interests that take precedence over parents' interests in Probate Code section 1516.5 cases —the child's interest in stability and the guardians' interest in care and custody—were not present to nearly the same degree.  Here, the guardians' interests were irrelevant because they had been deemed unfit to care for D.H.; the prospective adoptive family's interests were nascent, as they had only recently started caring for D.H.; and D.H.'s interest in stability had been unfortunately stalled by the difficulty in finding him a prospective adoptive home.

*In re Guardianship of Ann S.* highlights additional "significant" distinctions between dependencies and probate adoption proceedings.  (*In re Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1122 ["The differences between probate guardianships and dependency proceedings are significant"].)  "A section 1516.5 proceeding is brought to permit a private adoption by the guardian.  Dependency proceedings are fundamentally different."  (*Id.* at p. 1133.)  In probate guardianships, "[u]nlike dependency cases, . . . [i]t is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited." (*Id.* at p. 1122)  "The state is not a party to a probate guardianship, and its resources are not pitted against the parent.  [Citation.]  Nor does the state assume jurisdiction over the child and proceed toward family reunification or an alternative permanent placement . . .

23

Rather, probate guardianship is a private custody arrangement, approved but not supervised by the court. The state initiates no proceedings and carries no burden to prove anything. It performs only a judicial role." (*Id.* at p. 1133.) These significant differences lend further support to our decision not to extend the holding of *In re Guardianship of Ann S.* and *Charlotte D.* to this case.

DPSS points out that the authors of California Juvenile Courts Practice and Procedure have noted the rationale behind the best interest analysis in Probate Code section 1516.5 may apply to dependencies. Their treatise states: "An argument can be made that under *Charlotte D.* and *Guardianship of Ann S.*, a finding of unfitness is not constitutionally required in all cases involving a presumed . . . parent before their rights can be terminated, where the child has developed a protected interest in remaining with the adoptive parents, and doing so is in their interest. In such cases the court should look to the nature of the relationship between the parent and the child, and whether the parent demonstrated a commitment to his or her parental responsibilities . . . This is an area to watch for further developments." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2016 ed.) § 2.60[7], p. 2-143.)

Whether or not we agree there may be factual scenarios where a best interest analysis would sufficiently protect a presumed father's constitutional rights in a dependency setting—an issue we need not decide here—we hold this is not one of those scenarios. D.H. had lived with his prospective adoptive parents for only three months and the record contains scant information about the bond they shared. Additionally,

24

because the dependency proceeding was entirely focused on the grandparents' ability to care for D.H., the record also contains minimal information about father. These information gaps are significant. For example, we do not know if father struggles with substance abuse, nor can we say how much he participated in D.H.'s life during the guardianship or what were the circumstances surrounding the grandparents' guardianship petition. Faced with such unknowns, "any *lack* of information . . . has to be held against the department, not against [the parent]." (*Z.K.*, *supra*, 201 Cal.App.4th at p. 67.)

We note DPSS's reports indicate there were probate proceedings in 2010 in which the probate court granted the grandparents' guardianship application. On remand, the juvenile court may review D.H.'s probate file to determine if it contains any findings relevant to father's parental fitness. If so, the juvenile court may consider them in its analysis, bearing in mind however, that its conclusion as to detriment must be based on father's *current* circumstances. (*Cynthia D.*, *supra*, 5 Cal.4th at p. 256 [detriment finding must occur in the proceeding where parental rights are terminated and be based on current circumstances]; see also *In re Rodrigo S.* (1990) 225 Cal.App.3d 1179, 1186 ["a finding of detriment to the [dependent] child must be based on present circumstances rather than on the family situation which existed at the time the child was initially removed from parental custody"].)

We reiterate the sentiments of the Second District in *G.S.R.*, when it reversed a termination order for the same reason we do here: "We recognize and regret the procedural and emotional difficulty of undoing this fundamental error at this stage of the

process, . . . Still, we cannot allow the process to continue on the path toward termination of parental rights without further review in the trial court. We cannot undo the process but we can pause and restart the proceedings." (*G.S.R.*, *supra*, 159 Cal.App.4th at p. 1215 [reversing the termination order based on "DCFS's failure to demonstrate sufficient detriment and the juvenile court's failure to find a legitimate basis for deeming him unfit"]; see also *Gladys L.*, *supra*, 141 Cal.App.4th at p. 849 ["Although . . . reversal . . . undermines the important goal of rapidly concluding dependency proceedings, it is the only way to safeguard [appellant's] rights as [the] presumed father and ensure that he is afforded due process"].) In future cases where a parent is not named in the petition, DPSS can avoid this kind of delay by presenting evidence of detriment and requesting the court make a specific finding against the parent as soon as it anticipates recommending termination of that parent's rights.

## III

## DISPOSITION

We reverse the order terminating father's parental rights and remand the case to the juvenile court to determine whether there is clear and convincing evidence to support a finding of parental unfitness or detriment, based upon the facts as they currently exist. If the court finds detriment, the order terminating parental rights shall be reinstated.

CERTIFIED FOR PUBLICATION

SLOUGH _____
                                                                J.

I concur:

CODRINGTON _____
                        J.

26

[*In re D.H.,* E066818]

RAMIREZ, P. J., Concurring and Dissenting

Today my colleagues hold that the juvenile court erred by terminating parental rights of D.H., Sr., a noncustodial father, because no unfitness or detriment finding had been made as to him prior to severing the familial relationship. I agree that the juvenile court erred, but I dissent from the majority's assumption that no finding of detriment had ever been made and that father's noncustodial status had not been interrupted by a removal of custody, when the record is incomplete. In my view, remand should be ordered to direct the juvenile court to review the probate guardianship file to determine the nature of the factual findings made in that proceeding, where, as a matter of law, custody was removed from both parents.

**DISCUSSION**

The majority concludes that reversal of the termination of parental rights is required because there was never a finding of detriment against father, nor was there a removal of custody from him. This is a bold statement given that at no time has this court, nor the trial court, nor any of the parties sought to review the guardianship file.

Because the appointment of a guardian involves an award of custody to a nonparent, there was necessarily a removal of custody from both parents. The question is whether that guardianship was instituted upon nomination by the parents, or by a petition filed by the grandparents.

1

A guardian may be nominated by a parent (Prob. Code, § 1500; *Guardianship of Vaughan* (2012) 207 Cal.App.4th 1055, 1069), or a nonparent may petition for appointment of a guardian on the ground it is necessary or convenient. (Prob. Code, §§ 1510, subd. (a) & 1514, subd. (a).) If the parents have consented to the appointment of a guardian, the court need only find that guardianship is necessary or convenient. (Prob. Code, § 1514, subd. (a).) In such a situation there is no finding of detriment or unfitness; the court merely determines if guardianship is necessary or convenient. (Prob. Code, § 1510, subd. (b).) However, if the parents did not initiate or consent to the guardianship, the Probate Code expressly specifies that the appointment of a guardian is governed by the Family Code chapters beginning with sections 3020 and 3040, pertaining to parental custodial rights and preferences. (Prob. Code, § 1514, subd. (b)(1).)

Family Code section 3020 declares that the health, safety, and welfare of the child is the court's primary concern, and that it is the public policy of the state to assure that children have frequent and continuing contact with both parents after separation or dissolution of marriage or the end of their relationship, except where the contact is not in the child's best interest, as provided in Family Code section 3011. Family Code section 3040 lists the statutory order of preference for custody of a child. Significantly, Family Code section 3041, subdivision (a), provides in part that "Before making an order granting custody to a person or persons other than a parent, over the objection of a parent, the court shall make a finding that granting custody to a parent would be detrimental to

2

the child and that granting custody to the nonparent is required to serve the best interest of the child."

The majority contends that a parent must be found "unfit" before parental rights can be terminated in a dependency and that the court's mistaken belief that it had denied father services under Welfare and Institutions Code section 361.5, subdivision (a), means that the sole basis for termination of his rights was a best interest analysis. (Maj. opn. pp. 16-17.) This conclusion is based on speculation that the probate court did not remove custody from father based upon a finding of detriment. However, although the term "unfit" is not actually defined by statute, case law reveals the term "describes the situations that bring a minor within the dependency jurisdiction of the juvenile court." (*Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 602-603, citing *Guardianship of Kaylee J.* (1997) 55 Cal.App.4th 1425, 1431, fn. 2.) Detriment, as that term is used in dependency proceedings, is the standard. It is the standard used in dependency proceedings to remove custody from a parent and eventually terminate parental rights. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256 (*Cynthia D.*)

The Court in *Cynthia D.* explained that unlike termination hearings evaluated in *Santosky v. Kramer* (1982) 455 U.S. 745, and *In re Angelia P* (1981) 28 Cal.3d 908 (holding that a finding of unfitness by clear and convincing evidence pursuant to Civil Code section 232 did not violate due process), Welfare and Institutions Code section 366.26 hearings were not intended to accumulate further evidence of parental unfitness

3

and danger to the child, but to begin the task of finding the child a permanent alternative family placement.  (*Cynthia D., supra,* 5 Cal.4th at p. 253.)  The Court stated, "By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple findings of parental unfitness."  (*Ibid.*)  Yet, nowhere in the 1987 statutory scheme is a juvenile court required to find either an unfit home (as would have been adjudicated under the pre-1987 version of section 300, subdivision (d) [1982 Stats., ch. 977, § 2.5, p. 3503].)  Instead, Welfare and Institutions Code section 361 authorized removal of custody upon a finding a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor.  (Welf. & Inst. Code, § 361, subd. (c)(1).)

It is apparent that in finding the scheme (which permits termination of parental rights without any finding of unfitness) passed constitutional muster, our Supreme Court considered the terms "unfitness" and "detrimental" to be equivalents, because it concluded that unfitness had been established despite the fact that at no time in a dependency proceeding is a parent found to be unfit.  The only way to reconcile the court's holding that the due process concerns of *Santosky* had been met (*Cynthia D., supra,* 5 Cal.4th at p. 256), is to equate the two concepts.

The term "unfitness" is not a "talismanic incantation" that imposes a higher standard.  My interpretation finds support in Supreme Court precedents predating the 1987 revisions.  As far back as 1974, the California Supreme Court has recognized that

4

parental rights may be terminated upon a showing of detriment, insofar as unfitness was no longer the standard. (*In re B.G.* (1974) 11 Cal.3d 679, 683, 695, 699.)

Similarly, in guardianship proceedings, early authorities held that parents were entitled to retain custody unless affirmatively found unfit. (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122-1123, citing 14 Witkin, Summary of Cal.Law (10th ed. 2005), Wills and Probate § 928, pp. 1031-1032.) Although the court noted the significant differences between a Probate Code guardianship and dependency proceedings (*Guardianship of Ann S., supra,* 45 Cal.4th at p. 1122), it observed that the appointment of a guardian is governed by Family Code chapters beginning with sections 3020 and 3040, requiring a finding of detriment. (Prob. Code, § 1514, subd. (b); *Guardianship of Ann S., supra,* 45 Cal.4th at p. 1123.) As indicated above, the detriment standard used is the same standard applied in dependency proceedings.

I agree that there are separate and distinct purposes of the juvenile, family, and probate courts (*In re J.T.* (2014) 228 Cal.App.4th 953, 961), but the principle that parenting is a fundamental right (see *Stanley v. Illinois* (1972) 405 U.S. 645, 651 [parenting is a basic civil right]; *In re B.G., supra,* 11 Cal.3d at pp. 688-689) is a thread that runs through all three, applicable in Family Court, Probate Court, and Juvenile Court. The majority has pointed to no authority suggesting that the definition of detriment sufficient to warrant an award of custody to a nonparent in a Family Law or Probate guardianship case is lesser than the standard of detriment applicable in dependency

5

proceedings. All require a showing that parental custody presents a substantial risk of harm to the child,[1] and none require a finding of unfitness.

Here, we know that the grandparents were appointed as guardians in 2010, but we do not know the basis for the appointment of legal guardians, and the trial court did not have that information before it. Without that information, it is impossible to say that there has never been a finding of detriment as to father. Even if father consented to the guardianship, the judgment making the child a ward of his grandparents necessarily involved a removal of custody from his parents in order to award custody to the guardians.

Moreover, if the grandparents filed a petition that was contested, there would necessarily have been a detriment finding pursuant to Family Code section 3041, subdivision (a), to warrant the award of custody to a nonparent. In probate guardianships, a finding of detriment made in accordance with Family Code section 3041, must be established by clear and convincing evidence, so unless father consented to the guardianship, the appointment of a legal guardian of D.H. necessarily comported with *Santosky* and due process. If such a finding was made, the judgment terminating parental rights is proper because there has been both a detriment finding and a removal of custody from the father.

---

[1] It should be noted that Family Code section 3041, subdivision (c), states only that the definition of "detriment to the child" *includes* the harm of removal from a stable placement, and in no way limits a finding of detriment to such situations.

6

The failure of the parties, the juvenile court, and now this Court, to review the Probate Court file pertaining to the guardianship in order to determine what type of petition was filed, as well as the nature of the findings and order that were made as to that petition, precludes us from making any determination that there has never been a finding of detriment made against father. We just do not know, and it is inappropriate for us to engage in fact-finding on appeal. Further, it is legally and factually incorrect to say that the child had never been removed from father's custody. The appointment of a legal guardian necessarily involved a removal of legal and physical custody from the parents, so whether they agreed to it or not, there has been a removal of custody from father.

The majority notes that there has never been a juvenile dependency petition filed against father. (Maj. opn. p. 16) However, if the child had been judicially removed from father's custody upon a finding of detriment in the guardianship matter, naming him in the dependency petition or removing custody from him—again—at the disposition hearing would have been redundant, and the law neither does nor requires idle acts. (Civ. Code, § 3532.) It is for this reason that, on remand, the trial court should first review the entire probate guardianship file to determine whether custody has previously been removed from father upon a finding of detriment.

In any event, the trial court should have followed the proper procedures for termination of the guardianship, as set forth in Welfare and Institutions Code section 366.3, subdivision (b)(2) and (3), where parental rights were not previously terminated. Following this procedure would give the juvenile court an opportunity to consider

7

father's current circumstances and allow father to request custody of his child and afford the court an opportunity to determine whether an award of custody to father would be detrimental within the meaning of Welfare and Institutions Code section 361.2.

For this reason, I am compelled to agree that the judgment must be reversed. However, in my view the remand should direct the juvenile court to ascertain from the Probate Court guardianship file whether detriment was found in the course of those proceedings. If detriment was found there, the order terminating parental rights should be reinstated and the adoption should proceed because he was not a noncustodial parent within the meaning of Welfare and Institutions Code section 361.2, who would be entitled to custody. (See *In re A.A.* (2012) 203 Cal.App.4th 597, 609 [definition of noncustodial parent does not include a parent from whom child has been removed upon a finding of detriment].)

If there was no finding of detriment in the process of appointing the legal guardians, the juvenile court should proceed pursuant to Welfare and Institutions Code section 361.2, to determine if placement with a noncustodial parent would be detrimental.

For these reasons, I dissent from the views expressed by the majority, although I concur in the judgment.

RAMIREZ          
P. J.

8