Filed 2/25/21  In re N.P. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re N.P., a Person Coming Under the Juvenile Court Law. | C092148 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.P.,<br><br>Defendant and Appellant. | (Super. Ct. No. STKJVDP20190000013) |

C.P., the biological father of the minor (father), appeals from the juvenile court's order terminating his parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  He challenges the court's finding that he was the minor's

---

[1]    Unspecified statutory references are to the Welfare and Institutions Code.

1

biological father and not the minor's presumed father. He also contends his attorney rendered prejudicial ineffective assistance of counsel. We will affirm the judgment.

BACKGROUND

The newborn minor N.P. came to the attention of the San Joaquin County Human Services Agency (Agency) in December 2018, after mother and the minor tested positive for amphetamines. Mother admitted using methamphetamine two months prior to the minor's birth and to using four or five times during pregnancy, and she further admitted having obtained only limited prenatal care. Father, who mother identified as the minor's biological father, stated his name appeared on the minor's birth certificate, which he signed.[2] Father and mother (parents) were not married. The parents were unable to verify they had supplies for the newborn minor or a place for themselves and the minor to stay. The parents signed a safety plan stating that mother would go to Central Intake to participate in an assessment and do whatever was recommended. However, she failed to do so.

The parents arranged for the maternal grandmother to care for the minor. The maternal grandmother informed the social worker that the parents were homeless and mother was using drugs. The Agency provided the maternal grandmother with resource family approval (RFA) information.

On January 9, 2019, the Agency filed a dependency petition on behalf of the minor pursuant to section 300, subdivisions (b) and (g), alleging failure to protect the minor and failure to provide support for the minor due to the parents' transient lifestyle. The petition alleged that mother identified father as the minor's father and stated he was present at the minor's birth and his name appeared on the birth certificate. The petition

_____

[2]      Father had two other children, both of whom were under the legal guardianship of the paternal grandmother. Mother had two other children, each of whom was in the care of a legal guardian.

2

further alleged father reported completing a Prop 36 drug treatment program through probation approximately three to four years prior to address his use of methamphetamine and marijuana. Father was aware of mother's drug use and its detrimental effects on the minor but failed to address the problem. It was also alleged that father had a pattern of behavior and criminal convictions beginning in 2006 and continuing through 2018, placing the minor at increased risk of abuse and neglect.

At the January 10, 2019 detention hearing, the court asked father if he was present at the time of the minor's birth, if he signed the birth certificate, and if he signed the voluntary declaration of paternity or any other documents. Father responded affirmatively to each of those questions. When father stated he did not bring the documents with him to court, the court stated, "We need to see those so we can determine your status." The Agency stated father provided the same information to the social worker, but the Agency had not yet seen the documents. The court told father, "At this point you will remain as alleged father until we see the documentation," and, "If you have that, please bring it in or show social worker so we can elevate your status to bio or presumed father. But I need to see something on that." The court also indicated it would hold off on appointing counsel for father "until we get documentation." The court later told father, "[W]e will have to wait on you until we get more information, the documentation I mentioned. As soon as we get that, we can re-visit your status so that you can fully participate." The court found father to be an alleged father "until we receive the documentation" and ordered the minor detained with supervised visits for mother. At the Agency's request, the court authorized supervised visits for father at the Agency's discretion "if he provides copy of declaration of paternity."

The parents were not present for the January 24, 2019 jurisdiction hearing and could not be located or served despite diligent efforts. The court was informed that father had not yet provided a signed voluntary declaration of paternity or been appointed

3

counsel. The court proceeded in their absence, sustaining the allegations in the petition, and adjudging the minor a dependent of the juvenile court.

The parents participated in a January 29, 2019 child family team (CFT) meeting by telephone. It was determined that both parents would benefit from participating in services related to substance abuse treatment, parenting classes, and individual counseling. The parents were informed that the Agency would provide them with bus passes to assist them in getting to those services and were asked to make an effort to connect with the service providers.

The February 25, 2019 disposition report stated the Agency received the declaration of paternity reflecting father as father of the minor. The Agency requested that the court elevate father's status to biological father. The social worker had reportedly been unable to meet with the parents due to the parents' failure and refusal to appear at scheduled appointments, answer telephone calls, or return voicemail messages since the CFT meeting on January 29, 2019, or to otherwise remain in contact with the social worker. Since providing the declaration of paternity on February 1, 2019, father attended only two of six scheduled visits with the minor. On January 30, 2019, the minor was assessed and determined to be adoptable.

The report stated section 361.5, subdivision (a) applied to bypass reunification services to father. The Agency determined it would not be beneficial to the minor to provide father with services due to father's failure to remain in contact with the Agency or regularly attend visitation with the minor. Father had not been responsive to the Agency's requests for an interview or to discuss the case to complete family backgrounds. The report also noted father's extensive criminal history involving frequent incarcerations, noting it was not conducive to providing a safe and stable home environment for the minor. Based on these circumstances, the Agency recommended the court bypass father for services.

4

At the February 28, 2019 disposition hearing, the court declared father to be the minor's biological father and appointed counsel for him. The court ordered both parents to participate in drug court. Mother submitted to disposition. The court continued the matter as to father and ordered visitation to continue at the current schedule but noted visits would be reduced if missed.

At the March 14, 2019 continued disposition hearing, the court reduced the parents' visits to once per week and gave the Agency discretion to increase visits.

At the contested disposition hearing on April 18, 2019, the court heard testimony from father, who stated he signed the declaration of paternity, held himself out as the minor's father, and stayed with the minor for several days while mother remained in the hospital after birth. Father testified he was not allowed to have visitation with the minor in the beginning of the dependency case unless he brought the declaration of paternity to court. However, once the maternal grandmother provided the document, father was granted visitation. He received referrals for parenting classes and individual counseling. He completed orientation for the parenting class and planned to attend the first of 12 classes that night. He met twice with his counselor. When asked whether there were any other services the Agency wanted him to participate in, father stated he was to "be there to support [mother] through her rehab or whatever they were doing with her, the New Directions," but mother did not go to rehab. Father testified he already completed "my Prop 36, chemical dependency counseling centers, all the obstacles that I've done throughout my drug history." Father testified he was willing to complete his parenting classes and counseling and participate in visits and would be working on getting a truck driving job. He stated he was committed to participating in services even if mother did not, and he was willing to separate from mother if necessary. Father also testified he had temporary housing.

Father admitted that he never told his social worker that the maternal grandmother had the signed declaration of paternity. As a consequence, he did not have a formal

5

visitation schedule for the first month and then, once the declaration was provided to the Agency, visits were scheduled. He admitted he was provided six informal visits in January but attended only two. He denied reports that he missed a visit on March 16, 2019, and he and mother showed up over 20 minutes late on other visits.

Father testified he completed the Prop 36 drug program approximately eight years ago. He admitted he had a conviction for possession of a controlled substance within the last two and a half years and was still struggling with substance abuse. He stated he completed outpatient drug treatment in late 2017 or early 2018. Father claimed he was unaware mother was using drugs during her pregnancy even though he was with her "[t]he whole time." He testified he used methamphetamine two or three months prior to the hearing and used marijuana the day prior. He denied the court or the Agency ever asked him to be assessed for substance abuse treatment. When asked what he was doing in terms of his drug treatment, he stated, "Staying away. Staying away from the people, the crowd, the acquaintances that are down there in that tent city." He stated he was not going to NA meetings because he was not instructed to do so. When asked if he would go into residential drug treatment if the court ordered him to do so, father answered, "No. I will not go," adding he would not go if it meant he would have to give up trucking school. He testified he would choose trucking school over getting the minor back because "my daughter will always be there, I guess, but my career won't."

Social worker Claudette Butman testified the Agency informed father "many times" that it would provide him with bus passes so he could avail himself of services. Butman informed father about the bus passes at the CFT meeting, at court appearances, and in a letter sent to him on March 14, 2019, but he never came to pick up the passes. The March 14, 2019 letter set out the referrals that were being made for services for him, including parenting classes and individual counseling. Butman spoke with father on the telephone on March 26, 2019, at which time father confirmed he received the letter but stated he had not yet done anything regarding those services because he was waiting for

mother to engage in her services. Butman also encouraged father to engage in services at the January 2019 CFT meeting and every time he attended a court hearing. She confirmed that, during the CFT meeting, father was informed he would need to participate in a substance abuse treatment program, to which he was opposed.

Butman testified there was an approximate one-month delay in establishing paternity. However, contrary to father's statement that the maternal grandmother was in possession of the paternity declaration, Butman testified the maternal grandmother stated the declaration was in the parents' possession and offered to assist them in getting it to the Agency. At the CFT meeting in late January 2019, the parents were reminded that father could not participate in visitation until he provided a copy of the declaration. Butman testified the maternal grandmother obtained a copy of the declaration from the parents, scanned it, and provided it to the Agency via e-mail. Thereafter, father was not referred to services until March 2019 due to the time necessary to request financial agreements and make referrals.

The court noted father had been slow to make his appointments and engage in services. He had only a handful of visits and was not bonding over the first four months of the minor's life. The court also noted father only seemed willing to engage as long as the services did not interfere with "other things that are on your plate," and did not find father was fully committed to reunification or that there was a sufficient likelihood that father would provide stability for the minor on a regular basis. The court found a substantial danger to the minor if returned to father and no reasonable means by which to protect the minor without removal. The court further found that it would not benefit the minor to provide reunification services to father and bypassed services pursuant to section 361.5, subdivision (a). The court maintained the current visitation schedule and encouraged the parents to attend every visit.

The August 2019 status review report stated the parents continued to be transient, failed to return the social worker's voicemails to contact her to meet and review their

7

case plan, and failed to attend scheduled visits with the minor. An absent parent locator revealed an address for the parents in Lodi to which the Agency sent correspondence. But for one attempt to contact the social worker, father otherwise failed to return messages or attend any of his scheduled office visits. It was unknown whether father was employed, and it was noted that he might be incarcerated. Both parents were inconsistent with visits and on July 20, 2019, due to the parents' failure to show up on three consecutive occasions, visits were canceled. It was noted that father had been in and out of jail making his visits inconsistent. When the parents did visit, the maternal grandmother[3] supervised and noted the parents' lack of engagement and bonding with the minor. She also noted the parents were often late and would leave early. Mother fell asleep numerous times during visits and the maternal grandmother needed to constantly prompt both parents on what they should do with the minor such as feeding her and changing her diaper. The maternal grandmother also noted that father became easily frustrated with the infant minor and, shortly after he was bypassed for services, stopped visiting the minor altogether. The social worker made attempts to re-engage the parents in order to restart case plan services and visits, but the parents failed to respond to telephone calls or make any effort to contact the social worker. The Agency noted that mother was again pregnant and father was the father. The Agency requested that the court terminate mother's reunification services and change the permanent plan of reunification to adoption by the maternal grandmother.

Neither parent appeared for the August 27, 2019 review hearing. The court terminated mother's reunification services and set the matter for a section 366.26 hearing.

The December 2019 section 366.26 report stated the maternal grandmother notified the social worker that the parents were attending separate drug and alcohol

---

[3] The maternal grandmother's home was approved as an RFA home on May 14, 2019.

8

rehabilitation programs, with mother in San Jose and father in Monterey. The maternal grandmother had not heard from father since November 4, 2019. Mother called the maternal grandmother on November 18, 2019, and confirmed having recently given birth to her child, L.P. Mother called back on November 27, 2019, and stated she was able to keep her newborn as long as she remained in the rehabilitation program. The maternal grandmother had not heard from the mother since then. On December 11, 2019, both parents appeared in court and provided updated addresses. According to the maternal grandmother, the last visit father had with the minor was on June 22, 2019. The minor was assessed as adoptable on July 25, 2019. The maternal grandmother was an RFA-approved home and was committed to providing permanency for the minor through adoption. All of the minor's needs were being met by the maternal grandmother and she was thriving in the maternal grandmother's care. The Agency recommended termination of parental rights.

The March 2020 status review report stated that father told the social worker on January 22, 2020, that he left the drug and alcohol rehabilitation program in Monterey because "I have remained clean" and "it was a non-vocational training program and that they would not assist him with finding a job." He admitted he left the program "to move forward with his career," stating he was part of the "Vocational Drug Court Training" and was seeking employment. He also admitted he was residing with his parents where he planned to remain while seeking employment. Father told the social worker his parents would not allow mother to stay with them because they did not "see eye to eye." He confirmed he was taking care of the newborn, L.P., while mother resided at the Salvation Army Shelter in Lodi, but mother was welcome to see the baby as often as possible. The report noted that mother released herself prior to completing her drug and alcohol rehabilitation program because the program "was no longer working for her" and she wanted to be closer to her children.

9

The report noted there had been no effort on either parent's part to visit the minor since July 6, 2019.  On January 25, 2020, the maternal grandmother coordinated a visit at the maternal aunt's house.  During the visit, mother had very little interaction with the minor and father spent most of the visit playing games on his phone and interacting very little with the minor.  After the visit was complete, the parents made no effort to initiate scheduling another visit.  The maternal grandmother coordinated a second visit on February 8, 2020, at a Chuck E. Cheese restaurant.  Again, the parents had very little interaction with the minor during the visit, and after the visit no further visitation was requested.  The Agency recommended termination of parental rights.

Neither parent was present for the March 3, 2020 contested section 366.26 hearing.  Father's counsel requested a continuance.  Noting the parents set the matter as contested and notice was proper, the court denied the request and proceeded with the hearing.  The court found by clear and convincing evidence that the minor was likely to be adopted and termination of parental rights was in the minor's best interest.  The court further found that none of the exceptions to adoption existed and terminated parental rights, ordering adoption as the permanent plan.

DISCUSSION

I

*No Presumed Father Status*

Father contends the juvenile court erred when it treated him as a biological father and did not find he rose to the status of a presumed father.  As we shall explain, the claim lacks merit.

"An unwed father's rights and duties under the Uniform Parentage Act of 1973 (UPA), adopted by our Legislature as Family Code section 7600 et seq., substantially depend on whether he is a 'presumed father' within the meaning of Family Code section 7611." (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1228.)  "Whether a biological father is a 'presumed father' . . . is critical to his parental rights." (*Adoption of Kelsey S.* (1992)

10

1 Cal.4th 816, 823.) Only "presumed fathers" are entitled to custody and reunification services. (*In re P.A.* (2011) 198 Cal.App.4th 974, 980; *In re Zacharia D*. (1993) 6 Cal.4th 435, 448-449.) "The statutory purpose is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not. [Citations.]" (*In re Sabrina H*. (1990) 217 Cal.App.3d 702, 708.)

"A presumed father is a man who meets one or more specified criteria in [Family Code] section 7611." (*In re P.A., supra*, 198 Cal.App.4th at p. 979; see *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595.) Those criteria include the following: the presumed parent and the child's mother are or have ever been married and the child is born during the marriage or within 300 days after the marriage is terminated; the presumed parent and the child's mother attempted to marry before the birth of the child; the presumed parent and the child's mother marry or attempted to marry after the birth of the child; and the presumed parent "receives the child into their home and openly holds out the child as their natural child." (Fam. Code, § 7611, subds. (a)-(d).)

Family Code section 7611 also provides that a person "is presumed to be the natural parent of a child" if the person meets the conditions provided in section 7570, et seq., which address the establishment of paternity by voluntary declaration. In particular, Family Code section 7573 provides that "a completed voluntary declaration of parentage that complies with this chapter and that has been filed with the Department of Child Support Services is equivalent to a judgment of parentage of the child and confers on the declarant all rights and duties of a parent." (Fam. Code, § 7573, subd. (d); see *In re Raphael P*. (2002) 97 Cal.App.4th 716, 722-723; accord, *In re Liam L.* (2000) 84 Cal.App.4th 739, 747.)

Father argues the court's refusal to make a paternity finding until he produced a copy of the declaration was error. Not so. Family Code section 7573 provides that a voluntary declaration of parentage "takes effect on the filing of the document with the [Agency]." (Fam. Code, § 7573, subd. (c); see also Cal. Rules of Court, rule 5.635(c)

11

[declaration of paternity establishes parentage if it "has been executed *and filed with the [Agency]*"], italics added.)  Prior to that occurring, the father is a mere biological father in which case the court merely has discretion to offer reunification services based on a finding that it would benefit the minor.  (§ 361.5, subd. (a); *In re Zacharia D., supra*, 6 Cal.4th 435 at p. 451; *In re Joshua R.* (2002) 104 Cal.App.4th 1020, 1025.)

Here, father told the court on January 10, 2019, that he signed the declaration of paternity.  However, he was unable to produce a copy of the signed document at that time.  The court informed father he would need to bring the signed document to court or provide it to the Agency in order to elevate his status to presumed father and appoint counsel on his behalf.  At the CFT meeting on January 29, 2019, father had yet to produce a copy of the declaration and was reminded he could not participate in visitation until he provided one.  As father correctly notes, once a party provides "prima facie proof that he signed a voluntary declaration of paternity," he is entitled to rely on the presumption of Evidence Code section 664 to establish that the document was properly filed.  (*In re Raphael P., supra*, 97 Cal.App.4th at p. 738.)  However, unlike the appellant in *Raphael P.* who provided prima facie evidence in the form of a copy of the birth certificate showing his name, father and mother claimed father signed the declaration but provided no such prima facie evidence to support that claim.  While the court may determine parentage based on the statements of the parents, it is not required to do so.  (Cal. Rules of Court, rule 5.635(e)(3).)

Father argues the court failed its duty to obtain the declaration of paternity through inquiry of the Agency pursuant to California Rules of Court, rule 5.635(d)(2), which provides:  "The court must direct the court clerk to prepare and transmit *Parentage Inquiry—Juvenile* (form JV-500) to the local child support agency requesting an inquiry regarding whether parentage has been established through any superior court order or judgment or through the execution and filing of a voluntary declaration under the Family Code."  However, any such inquiry would have been futile since the declaration of

12

paternity was not yet filed and, as confirmed by the maternal grandmother, was in the parents' possession.

In any event, the maternal grandmother eventually obtained the declaration of paternity from the parents and provided it to the Agency on February 1, 2019. As social worker Butman subsequently testified, there was an approximate one-month delay in establishing paternity because, contrary to father's statement that the maternal grandmother was in possession of the paternity declaration, it was the parents who were in possession of the document and who had neither informed the Agency of that fact nor produced the document. The declaration was finally provided to the Agency once the maternal grandmother obtained it from the parents, scanned it, and e-mailed it to the Agency. Thereafter, on February 28, 2019, the court declared father to be the minor's biological father and appointed counsel for him.

Next, father claims the fact that he executed a voluntary declaration of paternity at the hospital when the minor was born presumptively established that he was the minor's presumed father. The fact that father executed a voluntary declaration of paternity entitled him to a presumption of parentage of the minor pursuant to Family Code section 7573, subdivision (c) and California Rules of Court, rule 5.635(c). It did not entitle him to presumed father status. (*In re Jovanni B.* (2013) 221 Cal.App.4th 1482, 1492.) Presumed father status is concerned with the issue of " 'whether a man has promptly come forward and demonstrated his " 'full commitment to his parental responsibilities—emotional, financial, and otherwise.' " [Citation.]' " (*Ibid.*)

While father was present at the birth of the minor and signed the paternity declaration, he did little else to demonstrate his full commitment to his parental responsibilities prior thereto or throughout the dependency proceedings thereafter. For example, prior to the birth of the minor, father was aware of mother's drug use but "look[ed] the other way" and did nothing to intervene. After the minor's birth, father failed to attend court hearings, failed to appear for scheduled appointments with the

13

social worker or answer or return her telephone calls, and failed to maintain contact with the social worker. He was not responsive to the Agency's requests for an interview or to provide information. He continued to use drugs despite having previously completed a Prop 36 drug program, including using methamphetamine as recently as January or February 2019 and regularly using marijuana, and he admitted he was still struggling with substance abuse. Yet he stated with certainty that he would not go into court ordered residential drug treatment if it meant he would have to give up trucking school noting, "my daughter will always be there, I guess, but my career won't." He eventually participated in drug treatment but left the program early. Father did not avail himself of bus passes to enable him to participate in services, and delayed participating in services claiming he was waiting for mother to engage in her services. Father attended only two of six scheduled visits with the minor early on. Thereafter, his visits were inconsistent and, when he did visit, the maternal grandmother noted he became easily frustrated with the minor and did little to engage or bond with the minor. Once father was bypassed for services, he stopped visiting the minor altogether.

In short, father failed to establish facts demonstrating he fully committed to his parental responsibility over the minor. Thus, he was, as the court determined, a biological father not a presumed father and, based on his lack of engagement as described above, the court determined it was not in the minor's best interest to offer reunification services to father.

Finally, father claims he suffered prejudice because his rights to due process, counsel, visitation, and reunification services were delayed and ultimately denied. As previously discussed, father's failure to produce the signed declaration of paternity resulted in an initial one-month delay. Once the maternal grandmother obtained the declaration from the parents and provided it to the Agency on February 1, 2019, father was provided visitation with the minor. He attended just two of the six scheduled visits.

14

In the interim, the parents failed to appear for the January 24, 2019 jurisdiction hearing and could not be located.  Father argues he was denied the opportunity to contest jurisdiction because, even if he had been present, the court maintained he had no rights until he produced the declaration of paternity.  Father mischaracterizes the court's statements.  At the initial detention hearing, the court stated it needed to see the declaration of paternity "so we can determine your status" and father would "remain as alleged father until we see the documentation," and asked father to show the signed declaration to the social worker or bring it to court "so we can elevate your status to bio[logical] or presumed father."  The court also informed father it would hold off on appointing counsel for him "until we get documentation," and stated it would have to wait until the documentation was produced so that it could "re-visit your status so that you can fully participate."  At no time did the court state or suggest that father had "no rights" unless and until he produced the declaration of paternity.  Further, we will not speculate as to what might have occurred had father appeared at the jurisdiction hearing.  He did not.

The parents did participate by telephone in the January 29, 2019 CFT meeting during which it was determined that both would benefit from participating in services related to substance abuse treatment, parenting, and individual counseling.  The parents were informed that bus passes were available and were asked to make an effort to connect with service providers.  They failed to remain in contact with the social worker, utilize the bus passes, appear at scheduled appointments, or answer the social worker's telephone calls or return her voicemail messages.

The court declared father to be the minor's biological father and appointed counsel for him on February 28, 2019.  At that time, the court ordered father into drug court.  The court further ordered father's visitation to continue at the current schedule but noted visits would be reduced if missed.  Visits were indeed reduced by the court on March 14, 2019,

15

presumably due to missed appointments.[4] Social worker Butman testified that father was not officially referred to services until March 14, 2019, due to the time necessary to request financial agreements and make referrals. By March 26, 2019, father had yet to engage in services, telling Butman he was waiting for mother to engage in hers. Butman referred father to services, made bus passes available to him to get to those services, and encouraged father to engage in services each time she saw him. He received referrals for parenting classes and individual counseling, completed orientation for the parenting class, and met twice with his counselor. However, despite having been informed at the CFT meeting that he would have to participate in a substance abuse treatment program, he failed to engage and stated adamantly that he would not participate in court ordered residential substance abuse treatment if it conflicted with truck driving school. He continued to use marijuana regularly. He failed and refused to remain in contact with the Agency. He also failed to regularly attend visits with the minor and, when he did attend (sometimes over 20 minutes late), he failed to engage or bond with the minor. Once he was bypassed for services, he ceased visiting the minor altogether.

The record makes plain that, after a brief delay due at least in part to father's own failure to produce the signed declaration of paternity or inform the court or the Agency of its whereabouts, father was found to be the minor's biological father and was appointed counsel and provided with reunification services and visitation. However, father demonstrated a lack of interest in or outright opposition to engaging in services, visiting or developing a bond with the minor, or participating in the dependency proceedings such that the court determined it was not in the minor's best interest to provide him additional services and eventually terminated parental rights. We conclude there was no error.

---

[4]    The record does not contain a reporter's transcript of the March 14, 2019 hearing.

## II

### *No Ineffective Assistance of Counsel*

Father contends his various attorneys rendered prejudicial ineffective assistance of counsel due to their failure to advocate for and protect his rights as a presumed father. In particular, he argues that, had any one of his three appointed counsel acted competently, he would have been recognized as the minor's presumed father and would have received visits and reunification services.

A parent claiming ineffective assistance of counsel has the burden of showing that counsel failed to act in a manner to be expected of reasonably competent counsel and that "counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711.) The parent must also show prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* at p. 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

"Reviewing courts will reverse . . . on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) When the record is silent on the reasons that counsel acted as they did, the case must be affirmed, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Pope* (1979) 23 Cal.3d 412, 426, abrogated on other grounds as acknowledged in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) "[I]ncompetent counsel does not mean the parent was in fact harmed as a consequence." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1152.)

17

As previously discussed, the record does not support father's claim that he was a presumed father.  Thus, his counsel's representation did not fall below an objective standard of reasonableness for electing not to pursue a claim of presumed parentage. Even assuming counsel should have done so, father cannot demonstrate that there was a reasonable probability of a more beneficial outcome given that father's actions did not demonstrate he was fully committed to his parental responsibility over the minor and, in any event, he received reunification services and visitation but failed to fully or consistently engage in either.  Father has not demonstrated that counsel's representation was inadequate.

## DISPOSITION

The juvenile court's order is affirmed.


_____/s/_____
BLEASE, Acting P. J.

We concur:


_____/s/_____
HULL, J.


_____/s/_____
MURRAY, J.